| | |
|---|---|
| TARPON BAY PARTNERS, LLC,<br>        Plaintiff, | No. 3:17-cv-579 (SRU) |
| v. | |
| ZEREZ HOLDINGS CORPORATION,<br>        Defendant. | |

## RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This dispute arose from an alleged agreement for Tarpon Bay Partners, LLC ("Tarpon

Bay") to acquire common stock shares of Zerez Holdings Corporation f/k/a Definitive Rest

Mattress Company, n/k/a Smart Cannabis Corp. ("Zerez") pursuant to a promissory note.  The

purported agreement broke down and Tarpon Bay filed this case asserting three causes of action

against Zerez: specific performance (count one); declaratory judgment (count two); and breach

of contract (count three).  *See* Am. Compl., Doc. No. 61.  In response, Zerez asserted eleven

counterclaims against Tarpon Bay, Southridge Advisors II, LLC ("Southridge"), and Stephen

Hicks ("Hicks") (together, "counterclaim defendants").  Counterclaims, Doc. No. 73 at 7-30.

Specifically, Zerez asserted: breach of implied contract against Tarpon Bay (counterclaim one);

declaratory judgment against Tarpon Bay (counterclaim two); breach of fiduciary duty against

Southridge (counterclaim three); usury against Tarpon Bay (counterclaim four); rescission

against Tarpon Bay (counterclaim five); fraudulent inducement against all counterclaim

defendants (counterclaim six); mistake against all counterclaim defendants (counterclaim seven);

aiding and abetting and civil conspiracy against all counterclaim defendants (counterclaims eight

and nine, respectively); violations of California Unfair Competition against all counterclaim

defendants (counterclaim ten); and violations of Connecticut Unfair Trade Practices Act

("CUTPA") against all counterclaim defendants (counterclaim eleven). *See* Counterclaims, Doc. No. 73.

Tarpon Bay seeks summary judgment on all three of its claims against Zerez and all twelve of Zerez's affirmative defenses. *See* Mot. Summ. J., Doc. No. 75. Further, the counterclaim defendants seek summary judgment on all eleven of Zerez's counterclaims against them. *Id.* Zerez also filed a motion to strike an affidavit from Hicks. *See* Mot. to Strike, Doc. No. 85. I held oral argument on May 23, 2019 and took all motions under advisement. For the following reasons, Tarpon Bay's Motion for Summary Judgment (doc. no. 75) is **denied** in part, **denied as moot** in part, and **denied without prejudice** in part. Zerez's Motion to Strike (doc. no. 85) is **denied.**

## I.    Motion for Summary Judgment (Doc. No. 75)

### A.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by

documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable", or is not "significantly probative", summary judgment may be granted. *Anderson*, 477 U.S. at 249–50. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party". *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

B. Background

The dispute between the parties arose from a purported agreement for Tarpon Bay to acquire Zerez common stock shares. Generally, Tarpon Bay alleges that it is entitled to a certain number of shares pursuant to a contract formed between Tarpon Bay and Zerez. *See generally* Am. Compl., Doc. No. 61. Zerez alleges generally that Tarpon Bay, Southridge, and Hicks behaved in a way during the alleged formation of the agreement that precludes the enforcement of any purported agreement. *See generally* Counterclaims, Doc. No. 73.

Tarpon Bay is a limited liability company "organized under the laws of the State of Florida." Tarpon Bay Rule 56(a)(1) Statement of Undisputed Facts ("56(a)(1) Stmnt"), Doc. No. 76 at ¶ 1. Zerez alleges that Tarpon Bay "holds itself out to provide business consulting services." Counterclaims, Doc. No. 73 at ¶ 4. Southridge is a Connecticut limited liability company, and Zerez alleges that Southridge "renders financial services to clients" and specializes in "direct investment and advisory services to small and middle market companies." *Id*. at ¶ 5. Hicks manages and owns both Tarpon Bay and Southridge. Counterclaims, Doc. No. 73 at ¶¶ 4-6. Zerez is a "corporation organized under the laws of the State of Oklahoma with headquarters in Roseville, California." 56(a)(1) Stmnt at ¶ 2. Zerez is a publicly traded company (previously traded under "ZRZH", now "SCNA") that "invests in, manages, and owns emerging companies and technologies." Counterclaims, Doc. No. 73 at ¶ 3.

The parties became acquainted in roughly January 2016. 56(a)(1) Stmnt, Doc. No. 76 at ¶ 8. At the time, Zerez alleges that it had over $500,000 in liabilities and "was seeking to reduce

its liabilities and raise new capital to fund operations and growth." Counterclaims, Doc. No. 73 at ¶ 15. The way the parties connected, however, is in dispute. Zerez alleges in its counterclaims that it was frequently receiving "'cold calls' from venture capitalists, fundraising brokers, or financial advisors offering to provide financial services … in exchange for stock" and in January 2016, Zerez received a cold call from Anish Aswani of Southridge. *Id*. at ¶¶ 16-17. Zerez alleges further that, in the cold call, Aswani "offered to provide financial advisory services to Zerez … [and] failed to disclose that he was working for Hicks … [and] that Hicks was involved in litigation" with the SEC and the state of Connecticut for fraud related to securities transactions. *Id*. at ¶ 17. Tarpon Bay, however, disputes that it (or someone connected to it) "cold called" Zerez but, instead, asserts that the parties were connected "through a third party familiar with both companies that had recommended to Zerez that Tarpon might be able to assist Zerez in reducing its carried debt[.]" 56(a)(1) Stmnt, Doc. No. 76 at ¶ 10.

Nonetheless, the parties agree that Zerez and a counterclaim defendant engaged in discussions around January 2016 "regarding a prospective transaction in which [Tarpon Bay or another party] would purchase debts owed by Zerez to various creditors and then obtain court approval for [Tarpon Bay or another party] to receive Zerez common stock in exchange for retiring the purchased debts." 56(a)(1) Stmnt, Doc. No. 76 at ¶ 8; Zerez 56(a)(2) Statement of Facts ("56(a)(2) Stmnt"), Doc. No. 84-14 at ¶ 8. Tarpon Bay alleges it was engaged in discussions and negotiations with Zerez, Zerez alleges it was Southridge via Aswani. *Id*. Nevertheless, the parties agree that the proposed agreement would exempt from registration the common stock received in exchange for retiring the debt, pursuant to section 3(a)(10) of the Securities Act of 1933.[1] *Id*. One of the purposes of the proposed transaction "was to reduce the

---

[1] Section 3(a)(10) is codified at 15 U.S.C. § 77c(a)(10), which provides an exception from registration for "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or

carried debt on Zerez's balance sheet, making it a more attractive candidate for future investors and lenders." 56(a)(1) Stmnt, Doc. No. 76 at ¶ 9; 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 9.

On or about January 15, 2016, the parties executed a Liability Purchase Agreement Confidential Term Sheet ("Term Sheet"). *Id*. at ¶ 12; *Id*. at ¶ 12. The Term Sheet provided that Tarpon Bay would purchase and retire up to $1,000,000 of outstanding liabilities held by Zerez's creditors. Term Sheet, Ex. C to Hicks Decl., Doc. No. 77-3 at 2. The Term Sheet further provided that after the retirement of the liabilities, Zerez would issue to Tarpon Bay shares of common stock "pursuant to court approved settlement agreement." *Id*. Tarpon Bay was to "seek court approval for the settlement of the Liabilities through the issuance of the" common stock shares "within [five] business days of execution of purchase agreements" with Zerez's creditors. *Id*. The amount of common stock to be issued was subject to the following limitations: (1) "up to but not exceeding 9.99% of the total outstanding shares of common stock per tranche"; (2) shares shall be "sufficient to satisfy the liabilities", but not more than necessary otherwise Tarpon Bay would return any excess shares; and (3) the shares could not allow Tarpon Bay to own more than 9.99% of the outstanding shares of Zerez common stock. *Id*. at 3.

Further, Tarpon Bay was entitled to the following fees: (1) a $25,000 signing fee which would be "due upon the execution of the term sheet" and was intended "to cover its expenses including the legal fees"; and (2) a success fee, a non-refundable commitment fee, which was to be "equal to the greater of (a) five percent (5%) of the aggregate amount of the liabilities in the settlement agreement or (b) $75,000.00, upon the approval of the fairness of the transaction by the court." *Id*. at 4. Both fees were to be paid "in the form of a convertible promissory note, maturing six (6) months from the date of issuance … [and] shall have no registration rights [and]

partly in exchange and partly for cash" so long as the terms of conditions of the agreement are judicially approved after a fairness hearing.

shall carry an annual interest rate of 10% and shall be convertible into the common stock of [Zerez] at 50% of the low closing bid price for the thirty (30) days prior to conversion." *Id*. at 4. The Term Sheet provided that the terms "do not constitute a contractual commitment" between the parties, "but merely represent[s] proposed terms for possible liabilities satisfaction", and "[u]ntil definitive documentation is executed by all parties, there shall not exist any binding obligation, other than as described in 'Confidentiality' and 'Exclusivity.'" *Id*. at 5. Hicks testified that the "definitive documentation" statement was "leftover" from a different agreement and the terms on the term sheet were "essentially terms of the understanding between Tarpon Bay and Zerez." Hicks Depo Tr., Ex. A to Reply in Supp Mot. Summ. J., Doc. No. 90-1 at 126:24-127:7. The Term Sheet was signed by Juan Murga, Zerez CEO, and Hicks "advised by" Southridge. *Id*.

On January 27, 2016, Zerez executed a 10% convertible promissory note in favor of Tarpon Bay in the amount of $25,000, in satisfaction of the signing fee obligation ("Promissory Note").[2] 56(a)(1) Stmnt, Doc. No. 76 at ¶ 24; 56(a)(2) Stmnt, Doc. No. 84-14 at 24. The Promissory Note "contained [a] provision for conversion of principal and accrued interested thereunder into unrestricted shares of Zerez common stock." 56(a)(1) Stmnt, Doc. No. 76 at ¶ 25; *see also* Promissory Note, Ex. E to Hicks Decl., Doc. No. 77-5 at ¶ 3. The conversion provision provides that the conversion price for common stock would be "at a 50% discount from the lowest closing bid price in the 30 trading days prior to the day [Tarpon Bay] requests conversion", unless otherwise modified, subject to modifications with respect to the closing bid price on the date in question. Promissory Note, Doc. No. 77 at ¶ 3. In the Promissory Note,

---

[2] Zerez seems not to dispute that it executed the note for purposes of the Signing Fee to Tarpon Bay. *See* 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 24. It did, however, purport to deny that Tarpon Bay elected to receive the Signing Fee in the form of a note, rather than cash. *See* 56(a)(1) Stmnt, Doc. No. 76 at ¶ 23; 56(a)(2) Stmnt, Doc. No. 84-14 at 23.

Zerez agreed "to instruct its stock transfer agent to reserve at least 500,000,000 shares of Zerez common stock for issuance to Tarpon Bay." 56(a)(1) Stmnt, Doc. No. 76 at ¶ 25; *see also* 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 25; Promissory Note, Doc. No. 77 at ¶ 12.

Tarpon Bay alleges that it sought out Zerez creditors who were amenable to selling their claims and, by the end of April 2016, it had entered into Claims Purchase Agreements with eight creditors to purchase claims against Zerez in the aggregate amount of $512,874.06. 56(a)(1) Stmnt, Doc. No. 76 at ¶¶ 26, 28; *see also* Claim Purchase Agreements, Ex. F to Hicks Decl., Doc. No. 77-6. Zerez admits that it was aware of certain discussions that were happening between Tarpon Bay/Southridge and Zerez creditors. 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 30.

The parties agree that court approval was required by section 3(a)(10) of the Securities Act "so that any common stock issued by Zerez to Tarpon [Bay] as payment for Success Fee earned in connection with the Claim Purchase Agreement would be exempt from registration." 56(a)(1) Stmnt, Doc. No. 76 at ¶ 31. Tarpon Bay, through its lawyers, commenced an action on June 13, 2016 in Florida state court[3] to obtain the necessary court approval. *Id.* at ¶ 32. Tarpon Bay alleges, and Zerez does not deny, that in order for the section 3(a)(10) action to succeed, Zerez would need to appear via counsel and "enter into a stipulation with Tarpon wherein the parties would recite the facts and circumstances leading up to the stipulation and stipulate as to the fairness of the transaction." *Id.* at ¶ 33; *see also*, 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 33. Tarpon Bay alleges, but Zerez denies, that Murga confirmed that Zerez had engaged a Florida attorney who would accept service of the complaint. 56(a)(1) Stmnt, Doc. No. 76 at ¶ 34; 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 34. As support for its contention that Zerez did so, Tarpon

---

[3] Specifically, Circuit Court of the Second Judicial Circuit, In and For Leon County Florida. *See* 56(a)(1) Stmnt, Doc. No. 76 at ¶ 32. The action was titled *Tarpon Bay Partners, LLC v. Zerez Holdings f/k/a Definitive Rest Mattress Company*, 2016-CA-001300. *Id.*

Bay cites to an email from Aswani to Murga in which Aswani states "the complaint for the [Section 3(a)(10) action] will be filed in court in the next 24 hours. Please let us know when you have Rick Savage engaged so that he can accept service of the complaint on behalf of Zerez" to which Murga responds: "Yes. I have contacted him, he will be sending me the paper work." June 13 Email, Ex. G to Hicks Decl., Doc. No. 77-7.

Despite Zerez's statement that it was in discussions with Attorney Savage, he nor any other attorney appeared for Zerez in the Section 3(a)(10) action, nor did Zerez provide contact information for an attorney who would accept service on Zerez's behalf. 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 35. Zerez contends Southridge had Savage contact Zerez and offer to represent it in the 3(a)(10) action, but required $7,000, a sum that Zerez did not expect to have to pay for representation in the action. Zerez Disputed Material Facts Stmnt ("Disputed Stmnt"), Doc. No. 84-14 at pg. 11, ¶¶ 25-26. Further, Zerez contends that, although Murga sent Aswani the June 13 email, Murga was not advised that he needed to take any further action in order for the 3(a)(10) action to proceed. *Id*. at ¶ 28.

The parties agree that the Florida state court action for the section 3(a)(10) approval did not proceed, but dispute the reason. Tarpon Bay alleges that Zerez "refused to participate" in the action and so the Claim Settlement Agreements could not be approved and therefore, despite its efforts, Tarpon Bay never earned the success fee for its purchase of the Zerez liabilities. 56(a)(1) Stmnt, Doc. No. 76 at ¶ 36. Zerez admits that it never issued a success fee note to Tarpon Bay (56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 36), but argues that Tarpon Bay failed to commence the litigation within 10 days of the execution of the Claims Purchase Agreement and that despite "nothing preventing it from doing so", failed to pursue the litigation "in any fashion after June 2016." Disputed Stmnt, Doc. No. 84-14 at pg. 12 ¶ 32.

On September 22, 2016, Murga emailed Aswani and stated that he was leaving Zerez and needed to "pull back on the filing" and asked what he had to do to "stop and cancel the 3(a)10 matter." Sept. 22 Email, Ex. H to Hicks Aff., Doc. No. 77-8. Later, on October 10, 2016, Murga, who was still acting as Zerez CEO and President at the time, sent a letter to Aswani in which Zerez "rescinds and cancels any and all consulting and/or services relationships with Southridge and/or Tarpon Bay … [and] rescinds and cancels the $25,000 [Signing Fee] Note[.]" Termination Letter, Ex. I to Hicks Decl., Doc. No. 77-9. Further, Zerez stated that it deemed the 3(a)(10) transaction to be abandoned because "no sufficient, adequate, nor material services ha[d] been provided" to Zerez and because "there ha[d] been no further efforts by the parties on completing the documents and/or performing on the proposed transactions." *Id*. Accordingly, Zerez "rescind[ed], cancell[ed], and withdr[ew] from said proposed transactions and said Note." *Id*. Tarpon Bay responded by letter from its attorneys on October 17, 2016 in which it stated that Zerez "ha[d] no grounds to rescind the [Signing Fee] Note" and that Tarpon Bay "rejects such attempt to rescind." Rejection Letter, Ex. J to Hicks Decl, Doc. No. 77-10 at 3. Further, Tarpon Bay demanded "immediate payment of all principal and interest due under the [Signing Fee] Note." *Id*.

Later, on November 29, 2016, Tarpon Bay issued a Conversion Notice to Zerez in which it elected to exercise its conversion right, pursuant to the Promissory Note. Conversion Notice, Ex. K to Hicks Decl., Doc. No. 77-11 at 2. Tarpon Bay asserted that it was entitled to 278,958,900 shares of common stock ("Conversion Shares") because the conversion share price was set at $0.0001/share (*see* 56(a)(1) Stmnt, Doc. No. 76 at ¶ 50) and the principal and associated fees totaled $25,800.00 plus accrued interest in the amount of $2,095.89. Conversion

Notice, Doc. No. 77-11 at 2. Zerez did not issue the shares to Tarpon Bay. 56(a)(1) Stmnt, Doc. No. 76 at ¶ 51; 56(a)(2) Stmnt, Doc. No. 84-14 at ¶ 51.

Tarpon Bay initiated this breach of contract action in April 2017 against Zerez in Connecticut state court. Zerez removed the action to this court on April 7, 2017. Notice of Removal, Doc. No. 1. Tarpon Bay filed an Amended Complaint on June 1, 2018 in which it alleges the following counts against Zerez: (1) specific performance of the Conversion Notice entitling Tarpon Bay to 278,958,900 common stock shares; (2) declaratory judgment that it is entitled to the shares; (3) breach of contract. Am. Compl., Doc. No. 71.

In its Answer, Zerez asserted the following affirmative defenses to Tarpon Bay's claims against it: (1) failure to state a claim; (2) unconscionability and/or unenforceability; (3) lack of consideration; (4) unclean hands; (5) estoppel; (6) failure to satisfy conditions precedent; (7) waiver; (8) laches; (9) rescission; (10) unjust enrichment; (11) misrepresentations in the forming of the contract; and (12) bad faith. Answer, Doc. No. 73 at 5-6.

In addition, Zerez filed counterclaims against Tarpon Bay, Southridge, and Hicks – the counterclaim defendants. Counterclaims, Doc. No. 73 at 7. Zerez alleges the following counts: (1) breach of implied contract against Tarpon Bay; (2) declaratory relief against Tarpon Bay; (3) breach of fiduciary duty against Southridge; (4) usury against Tarpon Bay; (5) rescission based on failure of consideration against Tarpon Bay; (6) fraudulent inducement against all counterclaim defendants; (7) mistake against all counterclaim defendants; (8) aiding and abetting against all counterclaim defendants; (9) civil conspiracy against all counterclaim defendants; (10) violation California Unfair Competition ("CUC") against all counterclaim defendants; and (11) violation of Connecticut Unfair Trade Practices Act ("CUTPA") against all counterclaim defendants. *Id*. at 22-29.

Tarpon Bay filed a Motion for Summary Judgment (doc. no. 75) in which it seeks summary judgment on all three of its claims against Zerez, and all twelve of Zerez's affirmative defenses. *See* Mot. Summ. J., Doc. No. 75. Additionally, in the same motion, all three counterclaim defendants seek summary judgment in their favor with respect to Zerez's eleven counterclaims against them. *Id*.

C. Discussion

    1. *Tarpon Bay's Claims Against Zerez*

Tarpon Bay's three claims against Zerez all stem from its general allegation that the Term Sheet obligated Zerez to provide Tarpon Bay with a Promissory Note and, although Zerez issued the Promissory Note, Zerez failed to perform when it did not honor Tarpon Bay's Conversion Notice. Accordingly, Tarpon Bay brought claims against Zerez for specific performance of the conversion note (count one), declaratory judgment (count two), and breach of contract (count three). *See* Am. Compl., Doc. No. 61. In Count One of its Amended Complaint, Tarpon Bay seeks an order compelling Zerez to honor the Conversion Notice, by which Tarpon Bay sought to convert its Promissory Note into common stock shares, and provide Tarpon Bay with 278,958,900 shares of Zerez's common stock. *Id.* at ¶¶ 5-6. In Count Two of its Amended Complaint, Tarpon Bay "seeks a declaratory judgment that it is entitled to delivery of the Conversion Shares." *Id.* at ¶ 27. In Count Three of its Amended Complaint, Tarpon Bay asserts that Zerez breached the promissory note, the Promissory Note, when it failed to deliver the Conversion Shares to Tarpon Bay. *Id.* at ¶ 31. Tarpon Bay asserts that it was damaged as a result of Zerez's breach and is entitled to actual damages, consequential damages, costs, expenses, and attorney's fees of at least $25,943,177. *Id.* at ¶ 33.

"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction …. [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words[.]" *Regency Sav. Bank v. Westmark Partners*, 59 Conn. App. 160, 164 (2000) (internal quotation marks omitted). "In Connecticut[4], a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of an agreement by the opposing party and (4) damages directly and proximately caused by the breach." *Censor v. ASC Technologies of Connecticut, LLC*, 900 F. Supp. 2d 181, 193 (D. Conn. 2012) (*citing McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504 (2006)). "[A]n agreement must be definite and certain as to its terms and requirements…. So long as any essential matters are left open for further consideration, the contract is not complete…. While all the terms of a contract do not need to be present, all the essential terms must have been agreed on." *RIDE, Inc. v. APS Technology, Inc.*, 11 F. Supp. 3d 169, 177 (D. Conn. 2014) (internal citations and quotation marks omitted), *reversed on other grounds*, *RIDE, Inc. v. APS Technology, Inc.*, 612 F. App'x 31, 33 (2d Cir. 2015). "A promissory note is nothing more than a written contract for the payment of money, and, as such, contract law applies." *Fid. Bank v. Krenisky*, 72 Conn. App. 700, 707 (2002); *see also Antonino v. Johnson*, 113 Conn. App. 72, 75 (2009).

Tarpon Bay argues that it is entitled to the Conversion Shares on the basis of the Promissory Note in which Zerez agreed to pay Tarpon Bay $25,000. Zerez alleges in its affirmative defenses, in part, that the Promissory Note was not supported by consideration and was unconscionable. Because there are issues of material fact with respect to whether the

---

[4] The parties agreed that the Promissory Note would be governed by Connecticut law. *See* Promissory Note, Ex. E to Hicks Decl., Doc. No. 77-4 at 5, ¶ 6.

Promissory Note was supported by adequate consideration and, further, whether the terms of the Note were unconscionable, Tarpon Bay is not entitled to summary judgment on its three claims against Zerez and, therefore, its Motion for Summary Judgment is denied.

    a.   Consideration

First, Tarpon Bay is not entitled to summary judgment on its three contract-based claims because there is a question of material fact with respect to whether the Promissory Note was supported by adequate consideration. Consideration "consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Viera v. Cohen*, 238 Conn. 412, 440-41 (2007) (internal citations and quotation marks omitted). Further, "[a]lthough an exchange of promises usually will satisfy the consideration requirement … a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract." *Id.* (internal citations and quotation marks omitted).

The parties seem to argue that the Promissory Note should be read in conjunction with the Term Sheet for purposes of consideration, because they agree that the $25,000 Note was executed pursuant to the Signing Fee contemplated in the Term Sheet. It is not clear that the two should be read together, though, because the Promissory Note does not refer back to and/or mention the Term Sheet, nor are the two inextricably intertwined, like a mortgage deed that is used to secure a promissory note. *See Regency Sav. Bank*, 59 Conn. App. at 164-65 (when the contract "refers to another instrument in such a manner as to establish that [the parties] intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties"); *see also Mongillo v. Commissioner of Transp.*, 214 Conn. 225, 229 (1990) ("Where there are multiple writings regarding the same

transaction, the writings should be considered together to determine the intent of the parties.").

Under either analysis, however, there is a question of fact with respect to the validity of the consideration for the Promissory Note and, therefore, summary judgment is not appropriate.

The Promissory Note states that the $25,000 owed to Tarpon Bay was "for value received" and, therefore, reading the Note on its own, the purported consideration is value received by Zerez from Tarpon Bay. Promissory Note, Ex. E to Hicks Decl., Doc. No. 77-5 at 2. Under Connecticut law, "for value received", without further explanation, is presumptively valid consideration. *Alcantra v. Pimentel*, 2017 WL 4621386, at *2 (Conn. Super. Ct. Aug. 21, 2017) ("In the case of … promissory notes, the expression *for value received*, raises a presumption of legal consideration." (quoting *Raymond v. Sellick*, 10 Conn. 480, 484 (1835)) (emphasis in original)). Here, however, that presumption is arguably rebutted. It is unclear whether Zerez received any benefit at all from Tarpon Bay in exchange for the $25,000 Promissory Note, which gives rise to the question whether the presumptive consideration contemplated in the Promissory Note was valid. There was no evidence to suggest that Tarpon Bay had to provide Zerez with any benefit in exchange for the $25,000, apart from any obligations it purportedly had under the Term Sheet. Indeed, Hicks testified that it was his understanding that, at the time the Promissory Note was signed, Tarpon Bay was entitled to the value of the Note regardless of whether Tarpon Bay "ultimately performed work." Hicks Depo Tr., Ex. B to Opp. to Mot. Summ. J., Doc. No. 84-7 at 109:2-109:23. Accordingly, there is a question with respect to whether Zerez received any value or benefit from Tarpon Bay in connection with the Promissory Note on its own.

Even if the two purported agreements were to be read together for purposes of consideration, it would still give rise to a question of fact with respect to whether there was adequate consideration for the Promissory Note. Tarpon Bay links the consideration for the

$25,000 back to the Term Sheet in arguing that it was entitled to the Promissory Note for the services it rendered in connection with buying Zerez's debt. The Term Sheet provides that the Signing Fee was due to Tarpon Bay "to cover its expenses including legal fees due upon the execution of the term sheet." Term Sheet, Ex. C to Hicks Decl., Doc. No. 77-3 at 4. The issue, though, is that there is a question of fact with respect to whether the Term Sheet was intended by the parties to be a binding contract. The Term Sheet provided that the terms "do not constitute a contractual commitment" between the parties, "but merely represent[s] proposed terms for possible liabilities satisfaction", and "[u]ntil definitive documentation is executed by all parties, there shall not exist any binding obligation, other than as described in 'Confidentiality' and 'Exclusivity.'" *Id.* at 5. Hicks testified that the "definitive documentation" statement was "leftover" from a different agreement and the terms on the term sheet were "essentially terms of the understanding between Tarpon Bay and Zerez." Hicks Depo Tr., Ex. A to Reply in Supp Mot. Summ. J., Doc. No. 90-1 at 126:24-127:7. Further, though, Hicks testified that Tarpon Bay was under no obligation to purchase Zerez's debts "until the [d]efinitive documents were done." Hicks Depo Tr., Ex. B to Opp. to Mot. Summ. J., Doc. No. 84-7 at 107:13-107:17. Therefore, Tarpon Bay cannot rely on any purported consideration found in the Term Sheet for purposes of summary judgment because there is a question of fact with respect to whether the Term Sheet was intended to be a binding contract and, therefore, whether the parties intended to be bound by it.

Accordingly, Tarpon Bay is not entitled to summary judgment on any of its three claims against Zerez because there is a question of material fact with respect to whether the Promissory Note was supported by adequate consideration.[5]

---

[5] Zerez also argues that Tarpon Bay failed to perform its obligations under the Term Sheet and, therefore, Tarpon Bay is not entitled to Zerez's performance on the Promissory Note. *Id.* Specifically, Zerez argues that Tarpon Bay

b.   Unconscionability

Additionally, Tarpon Bay is not entitled to summary judgment on its three contract-based claims because the Promissory Note was procedurally and/or substantively unconscionable and, therefore, unenforceable.

"[D]etermining whether a particular agreement is unconscionable requires a fact-intensive examination of the agreement at issue…. Ultimately, however, the issue of unconscionability is a question of law to be decided by the court." *Pierce v. Emigrant Mortg. Co.*, 463 F. Supp. 2d 221, 225 (D. Conn. 2006); *see also Emigrant Mortg. Co., Inc. v. Janice Crismara*, 2006 WL 3703861, at *3 (D. Conn. Dec. 11, 2006). "The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." *Cheshire Mortg. Service, Inc. v. Motes*, 223 Conn. 80, 88 (1992) (internal quotation marks omitted). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *R.F. Daddario & Sons, Inc. v. Shelansky*, 123 Conn. App. 725, 741 (2010) (internal quotation marks omitted).

Although "[t]here is no bright line test to establish when a contract is unconscionable", *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 31 Conn. App. 455, 463-64 (1993), courts look to "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."

---

failed to seek court approval within five days of executing the Claim Purchase Agreements with Zerez's creditors, in breach of the Term Sheet, and, further, never served Zerez with the complaint or took steps to pursue the section 3(a)(10) litigation.  Opp. to Mot. Summ. J., Doc. No. 84 at 12.  It seems clear, though, that the section 3(a)(10) process was material to the *Success* Fee, which Tarpon Bay would earn when it successfully retired Zerez's debt. The debt could not be retired without first being approved by the court through that section 3(a)(10) process.  The Success Fee is not at issue here, however, and the Signing Fee was due to Tarpon Bay for reasons separate from the Success Fee. Theoretically, Tarpon Bay could have been entitled to the Signing Fee, even if it was ultimately unsuccessful in retiring Zerez's debt.  Accordingly, the success of the section 3(a)(10) litigation, and who was at fault for its ultimate failure, is immaterial to the duties around the Signing Fee.

*Pierce,* 463 F. Supp. 2d at 225 (internal quotation marks omitted). In determining unconscionability, "the plaintiff's actions must be weighed against the defendant's business experience, the business practices of the community, and the relatively unequal bargaining power of the parties." *Edart Truck Rental Corp. v. B. Swirsky and Co., Inc*., 23 Conn. App. 137, 143 (1990). Unconscionability "is judged at the time of the making of the contract" and, therefore any claims that rely on "alleged actions taken by the plaintiff subsequent to the making of the contract" renders the doctrine of unconscionability inapplicable. *LaSalle Nat. Bank v. Freshfield Meadows, LLC*, 69 Conn. App. 824, 837 (2002). Unconscionability is divided into two parts: procedural and substantive. "Substantive unconscionability focuses on the content of the contract as distinguished from procedural unconscionability, which focuses on the process by which the allegedly offensive terms found their way into the agreement." *Pierce,* 463 F. Supp. 2d at 225. "Procedural unconscionability is intended to prevent unfair surprise and substantive unconscionability is intended to prevent oppression." *Hirsch v. Woermer*, 184 Conn. App. 583, 589 (2018).

Connecticut courts have not clearly decided whether a contract must be both procedurally and substantively unconscionable. Recent Connecticut Supreme and Appellate Court cases have held that both must be present. *See, e.g., Emeritus Senior Living v. Lepore*, 183 Conn. App. 23, 29 (2018); *Hirsch*, 184 Conn. App. at 589; *R.F. Daddario*, 123 Conn. App. at 741; *Bender v. Bender*, 292 Conn. 696, 732 (2009). Each case cites to the same quote, however, that a determination of unconscionability "generally requires a showing that the contract was both procedurally and substantively unconscionable when made—*i.e.*, some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are so unreasonably favorable to the other party." *See Lepore*, 183 Conn. App. at 29; *Hirsch*, 184

Conn. App. at 589; *R.F. Daddario*, 123 Conn. App. at 741; *Bender*, 292 Conn. at 732; *see also Bank of America, N.A. v. Aubut*, 167 Conn. App. 347, 379 (2016). That quote, however, originated in *Hottle v. BDO Seidman, LLP*, 268 Conn. 694, 719 (2004), in which the Connecticut Supreme Court was citing, interpreting, and applying *New York* law. Indeed, the unconscionability quote widely cited from *Hottle* derived from a New York decision, *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y. 2d 1, 10 (1988). This Court has also cited *Hottle* for the proposition that both procedural and substantive unconscionability are generally required but, "[i]n some rare cases, a contractual provision may be so outrageous as to warrant a court's refusal to enforce it based on substantive unconscionability alone." *D'Antuono v. Service Road Corp.*, 789 F. Supp. 2d 308, 327 (D. Conn. 2011) (citing *Hottle*, 268 Conn. at 720-21); *DaimlerChrysler Ins. Co. v. Pambianchi*, 762 F. Supp. 2d 410, 421 (D. Conn. 2011) (citing *Hottle,* 268 Conn. at 720-21, and *Bender*, 292 Conn. at 731).

Other, albeit earlier, Connecticut cases have held that both pieces of unconscionability are not necessary. *See Smith v. Mitsubishi Motors Credit of America, Inc.*, 247 Conn. 342, 354 (1998) ("Even in the absence of procedural unconscionability, Moore might avoid liability … if he could establish that the clause was substantively unconscionable"); *Cheshire Mortg.*, 223 Conn. at 89 ("the defendants have not established that the mortgage transactions in question were *either* procedurally *or* substantively unconscionable" (emphasis added)). It seems, though, that a contract cannot be held procedurally unconscionable alone. *See Smith*, 247 Conn. at 354 n.10 (procedural unconscionability without substantive unconscionability is "debatable" because "courts have resisted applying the doctrine of [unconscionability] where there is only procedural unconscionability without substantive unfairness." (internal citations omitted)); *DaimlerChrysler,* 762 F. Supp. 2d at 422 ("[T]he Court is not aware of any Connecticut

precedent which would permit the Court to void a contractual provision based solely on procedural unconscionability.").  Accordingly, I am not convinced that Connecticut requires that both procedural and substantive unconscionability be present; and it seems to me that only substantive unconscionability is required.  Regardless, though, both prongs are present here and the contract is, therefore, unenforceable.

Procedural unconscionability reflects situations such as hiding terms in a maze of fine print—and failing to alert the defendant to its existence—and unequal bargaining power. *D'Antuono*, 789 F. Supp. 2d at 328 (stating that the Connecticut Appellate Court has "indicated that a contractual provision might be procedurally unconscionable under all three of those circumstances" but finding that the contract at issue was not procedurally or substantively unconscionable).  "Superior bargaining power in itself is not enough to strike down a resultant contract as unconscionable.  Additional elements must be present, such as, a lack of meaningful choice … or [exploitation] by a stronger party who has control of the negotiations due to the weaker party's ignorance, feebleness, unsophistication as to interest rates or similar business or general naivete." *Fairfield Lease Corp. v. Romano's Auto Service*, 4 Conn. App. 495, 498-99 (1985).

"Under Connecticut law, a court cannot find procedural unconscionability unless the party opposing enforcement of a contractual provision has introduced some specific evidence of overreaching by the other party in the formation of the agreement." *DaimlerChrysler*, 762 F. Supp. 2d at 423 (citing *Smith v. Mitsubishi Motors Credit of America, Inc.*, 247 Conn. 342, 351-52 (1998)).  "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."

*William W. Backus Hospital v. Belisle*, 2016 WL 6118987, at *5 (Conn. Super. Sept. 6, 2016) (internal citations and quotation marks omitted). "[B]argaining improprieties in the contract formation process" is one type of procedural unconscionability. *Emlee Equip.*, 31 Conn. App. at 463 n.12. Thus procedural unconscionability can arise when a party plays no role in drafting the agreement. *Celentano v. Oaks Condominium Ass'n*, 2001 WL 83944, at *17 (Conn. Super. 2001).

The undisputed facts of the case show that Tarpon Bay very clearly exploited its superior bargaining power over Zerez, which was on the verge of financial collapse, in order to control the terms of the agreement, and resultant partnership, and deprive Zerez of any meaningful choice in the agreement. At the time of the purported agreement, Zerez was in a "precarious position" because it had "significant debt," over $500,000, and "was seeking to address [the debt] to remain viable." Opp. to Mot. Summ. J., Doc. No. 84 at 17; Murga Decl., Ex. A to Opp to Mot. Summ. J., Doc. No. 84-1 at ¶ 5. It was, of course, an attractive offer to Zerez that Tarpon Bay would retire a portion of Zerez's debt in exchange for a fee and/or Zerez common stock. Tarpon Bay, however, conditioned its retiring of Zerez's debt on Zerez signing the promissory note. Murga Decl., Ex. A to Opp to Mot. Summ. J., Doc. No. 84-1 at ¶ 15-16. Notably, however, Zerez "played no role" in drafting either the Promissory Note or the Term Sheet. *Id.* at ¶¶ 15, 18. Zerez's precarious financial position put it in a place of inferior bargaining power, one which Tarpon Bay exploited by drafting an agreement that was favorable to it and, effectively, taking away any meaningful choice Zerez had in the matter, if it sought to remain viable. Accordingly, the Promissory Note, which Tarpon Bay seeks to enforce, was procedurally unconscionable.

"Substantive unconscionability focuses on the content of the contract", *Pierce,* 463 F. Supp. 2d at 225, and encompasses situations where there are "overly harsh contract terms."

*Emlee Equip.*, 31 Conn. App. at 463 n.12. "Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided … [and are] indicated by contract terms so one-sided as to shock the conscience." *Backus Hosp.*, 2016 WL 6118987, at *5 (internal citations and quotation marks omitted). "Alternatively, [substantive] unconscionability consists of an allocation of risks and costs which is overly harsh or one-sided and is not justified by the circumstances in which the contract was made." *Id.* (internal citations and quotation marks omitted). "An excessive price charged to a consumer with unequal bargaining power could be considered unconscionable." *Id.* (citing *Murphy v. McNamara*, 36 Conn. Supp. 183 (1979) (unconscionable to charge $1,268 on installment for television with a retail price of $499.00)).

As analyzed above, Tarpon Bay arguably did not have to provide Zerez with any benefit in order to receive the $25,000 due under the Promissory Note. Even if the Promissory Note is read in conjunction with the Term Sheet, the Note was due immediately upon the execution of the Term Sheet, without any further action on Tarpon Bay's part. There is also a question, as discussed previously, about whether the Term Sheet was even intended to be a binding contract and, therefore, whether the Signing Fee was even due. Furthermore, the terms of the Promissory Note are extremely one-sided in Tarpon Bay's favor; it received $25,000 for nothing in return. Even more so, however, Tarpon Bay seeks in the complaint *over $25 million* which it alleges it is owed under the value of the stock at the time of the conversion notice. Effectively, then, Tarpon Bay argues that it is entitled to $25 million for little to nothing in return. Those terms of the Promissory Note are "so one-sided as to shock the conscience." *Backus Hosp.*, 2016 WL 6118987, at *5. It cannot be that Tarpon Bay receives at $25 million windfall with no promise in return or, at most, a promise to attempt to retire Zerez's debt.

Accordingly, the Promissory Note is both procedurally and substantively unconscionable and, therefore, unenforceable. Tarpon Bay's motion for summary judgment on its three contract claims against Zerez is **denied**.

2. *Zerez's Affirmative Defenses*

Tarpon Bay also moves for summary judgment on all twelve of Zerez's affirmative defenses. In its Answer, Zerez asserted the following affirmative defenses to Tarpon Bay's claims against it: (1) failure to state a claim; (2) unconscionability and/or unenforceability; (3) lack of consideration; (4) unclean hands; (5) estoppel; (6) failure to satisfy conditions precedent; (7) waiver; (8) laches; (9) rescission; (10) unjust enrichment; (11) misrepresentations in the forming of the contract; and (12) bad faith. Answer, Doc. No. 73 at 5-6. Because the agreement at issue in all three claims is unconscionable and, therefore, unenforceable, Tarpon Bay's motion for summary judgment on Zerez's affirmative defenses is **denied as moot**.

3. *Zerez's Counterclaims*

Tarpon Bay also moves for summary judgment on all eleven of Zerez's counterclaims. Zerez filed counterclaims against Tarpon Bay, Southridge, and Hicks – the counterclaim defendants. Counterclaims, Doc. No. 73 at 7. Zerez alleges the following counts: (1) breach of implied contract against Tarpon Bay; (2) declaratory relief against Tarpon Bay; (3) breach of fiduciary duty against Southridge; (4) usury against Tarpon Bay; (5) rescission based on failure of consideration against Tarpon Bay; (6) fraudulent inducement against all counterclaim defendants; (7) mistake against all counterclaim defendants; (8) aiding and abetting against all counterclaim defendants; (9) civil conspiracy against all counterclaim defendants; (10) violation California Unfair Competition ("CUC") against all counterclaim defendants; and (11) violation

of Connecticut Unfair Trade Practices Act ("CUTPA") against all counterclaim defendants. *Id*. at 22-29.

At oral argument, Zerez's counsel stated that it would likely abandon its counterclaims against Tarpon Bay if the contract at issue was found to be unconscionable. Accordingly, Zerez must file, within 30 days of this order, a notice regarding whether it will pursue its counterclaims. Tarpon Bay's motion for summary judgment on Zerez's counterclaims is, therefore, **denied without prejudice** subject to renewal if Zerez pursues its counterclaims.

## II.    Motion to Strike Affidavit (Doc. No. 85)

In addition, Zerez filed a motion to strike portions of Hicks' affidavit (doc. no. 77) on the basis that much of it is outside of his personal knowledge and/or contains inadmissible evidence. *See* Mot. to Strike, Doc. No. 85.

"Courts are generally disinclined to grant motions to strike portions of summary judgment exhibits[.]" *Garcia v. Law Offices of Howard Lee Schiff, P.C.*, 2018 WL 6590356, at *7 (D. Conn. Dec. 14, 2018). "[I]n the contexts of summary judgment, motions to strike are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion." *Carone v. Mascolo*, 573 F. Supp. 2d 575, 580 (D. Conn. 2008) (citing *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 231-32 (D. Conn. 2008)). "The parties to an action … should have faith … that the court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving *ipse dixit* of a particular party…. If a party wishes to argue that an asserted material fact is not supported by the evidence, the party may do so in its summary judgment briefing." *Id*. (internal quotation marks omitted). Accordingly, Zerez's Motion to Strike Hicks' Affidavit (Doc. No. 85) is **denied**.

### III.    Conclusion

For the foregoing reasons, Tarpon Bay's Motion for Summary Judgment (doc. no. 75) is **denied** with respect to its three claims against Zerez because the purported agreement is unconscionable as a matter of law.  The motion is **denied as moot** with respect to Zerez's affirmative defenses.  At oral argument, Zerez's counsel stated that it may withdraw its counterclaims against Tarpon Bay if the contract was held unconscionable.  Accordingly, Zerez must file a notice within thirty days from the date of this order regarding whether it intends to pursue its counterclaims.  Tarpon Bay's motion for summary judgment on Zerez's counterclaims is therefore **denied without prejudice**.  Zerez's Motion to Strike (doc. no. 85) is **denied**.

So ordered.

Dated at Bridgeport, Connecticut, this 24th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge