| | |
|---|---|
| TARPON BAY PARTNERS LLC,<br>    Plaintiff, | No. 3:17-cv-579 (SRU) |
| v. | |
| ZEREZ HOLDINGS CORP.,<br>    Defendant. | |

## ORDER

This is a case about a business relationship that began with promise in January 2016 but slowly deteriorated and came to a screeching halt in October 2016. The plaintiff—Tarpon Bay Partners, LLC ("Tarpon Bay")—is a financial services company. The defendant—Zerez Holdings Corporation ("Zerez")—is a publicly traded penny stock company that invests in emerging technologies. Zerez also sued Tarpon Bay in a separate case that was consolidated into this one, and so Tarpon Bay is also a counterclaim defendant here, along with two other parties—Southridge Advisors II, LLC ("Southridge") and Stephen M. Hicks ("Hicks")—that are closely related to Tarpon Bay: Southridge managed Tarpon Bay, and Hicks managed both Southridge and Tarpon Bay. Together, I will refer to Tarpon Bay, Southridge, and Hicks as the "Counterclaim Defendants."

In January 2016, the parties agreed—how formal the agreement was and whether it was a formal contract are matters in dispute—that the Counterclaim Defendants would purchase most or all of Zerez's outstanding debt from Zerez's individual creditors. Then, through a particular procedure contemplated by the federal securities laws, the Counterclaim Defendants would convert that debt into equity—Zerez's common stock. The Counterclaim Defendants would then

sell that equity into the open market and use the proceeds to pay back Zerez's creditors (and to make a profit themselves).

Of course, the deal broke down, and Tarpon Bay and Zerez sued each other. In January 2019, Tarpon Bay moved for summary judgment on its affirmative claims and the Counterclaim Defendants moved for summary judgment on Zerez's counterclaims. In September 2019, I denied Tarpon Bay's motion for summary judgment with respect to its affirmative claims because one of the contracts at issue was arguably unsupported by adequate consideration and, in any event, was unconscionable and thus unenforceable. I dismissed the Counterclaim Defendants' motion for summary judgment on Zerez's counterclaims because Zerez's counsel had indicated that Zerez would abandon its counterclaims if I held the relevant contract unenforceable as a matter of law.

But Zerez changed its mind because Tarpon Bay indicated its intent to appeal my ruling. Thus, the Counterclaim Defendants renewed their motion for summary judgment on all eleven of Zerez's counterclaims (listed below), doc. no. 124, and Zerez also moved for partial summary judgment on counterclaims two and eleven, doc. no. 134:

| Count | Claim | Defendant |
|-------|-------|-----------|
| 1 | Breach of implied contract | Tarpon Bay |
| 2 | Declaratory relief | Tarpon Bay |
| 3 | Breach of fiduciary duty | Southridge |
| 4 | Usury | Tarpon Bay |
| 5 | Rescission – failure of consideration | Tarpon Bay |
| 6 | Fraudulent inducement | Counterclaim Defendants |
| 7 | Mistake | Counterclaim Defendants |

| 8 | Aiding and abetting | Counterclaim Defendants |
|---|---|---|
| 9 | Civil conspiracy | Counterclaim Defendants |
| 10 | Violation of the California Unfair Competition Law ("UCL") | Counterclaim Defendants |
| 11 | Violation of the Connecticut Unfair Trade Practices Act ("CUTPA") | Counterclaim Defendants |

For the following reasons, I **grant in part and deny in part** both motions for summary judgment.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) (party must present affirmative evidence to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also*

*Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> [T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

The same standard applies to cross-motions for summary judgment. In that case, a court must "assess each motion on its own merits and view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inference in favor of that party." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)) (cleaned up).

## II. Background

A.    <u>Factual Background</u>[1]

Zerez alleges that Southridge is a limited liability financial holding company organized under the laws of Connecticut that "renders financial services to clients" and specializes in "direct investment and advisory services to small and middle market companies." Counterclaims, Doc. No. 73, at 8 (¶ 5).  Tarpon Bay is a limited liability company organized under Florida law that "make[s] investments and finance[s] small public companies in the U.S." Hicks Depo. Tr., Ex. B to Zerez's Opp'n, Doc. No. 133-2 ("Hicks Depo."), at 23:2–3.  Hicks ran the day-to-day operations of both Southridge and Tarpon Bay.  *See id.* at 19:21, 23:6.

Zerez is a corporation organized under Oklahoma law with headquarters in California. Zerez is a publicly traded company, but its stock is a "penny stock," meaning that it trades for very little money—in January 2016, for instance, Zerez's common stock traded between $0.02 and $0.04.  Zerez's stock traded on an over-the-counter market.  Zerez invested in and managed emerging companies and technologies.  In early 2016, Zerez was carrying over $500,000 in debt. Zerez was interested in trying to get that debt off its balance sheet so that it would be a more attractive company to investors.

The parties in this case became acquainted in January 2016.  The parties dispute how they connected.  According to Zerez, numerous financial firms were interested in acquiring its debt, and it was receiving "cold calls" from those firms; Anish Aswani ("Aswani"), a Southridge

---

[1]    I take the following facts from (1) the Counterclaim Defendants' Local Rule 56(a)1 Statement, Doc. No. 125; (2) the Declaration of Stephen Hicks in Support of the Counterclaim Defendants' Motion for Summary Judgment, Doc. No. 126; (3) Zerez's Local Rule 56(a)2 Statement, Doc. No. 84-14; (4) the Declaration of Juan Carlos Murga in Opposition to the Counterclaim Defendants' Motion for Summary Judgment, Doc. No. 133-1; and, occasionally, (5) Zerez's allegations in its counterclaims, Doc. No. 73.  Whenever a fact is disputed, I highlight the dispute and provide citations.

So far as I can tell, Zerez did not submit a Local Rule 56(a)2 statement of undisputed facts in opposition to Tarpon Bay's renewed Local Rule 56(a)1 statement.  However, the parties' renewed submissions are almost verbatim reproductions from their summary judgment submissions in early 2019.  *Compare, e.g.*, Counterclaim Defendants' Initial Local Rule 56(a)1 Stmnt., Doc. No. 76 *with* Counterclaim Defendants' Renewed Local Rule 56(a)1 Stmnt., Doc. No. 125 (same number of paragraphs, and subject matter of those paragraphs is the same).  As a result, to determine which facts are undisputed, I occasionally rely on Zerez's Rule 56(a)2 statement from March 2019, which was submitted in response to Tarpon Bay's initial Rule 56(a)1 statement.

employee, contacted them in that way.  *See* Counterclaims, Doc. No. 73, at 11 (¶¶ 16–17).  Zerez

alleges that Aswani "offered to provide financial advisory services to Zerez," "failed to disclose

that he was working for Hicks," and failed to disclose that "Hicks was involved in litigation"

with the SEC and the state of Connecticut for fraud related to securities transactions.  *Id*. at 11 (¶

17).  In contrast, Tarpon Bay claims that Aswani did not "cold call" Zerez.  Instead, Tarpon Bay

asserts that the parties were connected through a third party.  *See* Tarpon Bay's Rule 56(a)1

Stmnt., Doc. No. 125, at ¶ 10.

In any event, once acquainted, the parties engaged in discussions regarding a potential

Section 3(a)(10) transaction.  A Section 3(a)(10) transaction—so named because it is authorized

by that section of the Securities Act of 1933[2]—"exempts from registration securities issued in

exchange for other securities, where the issuance has been approved by a court or an appropriate

administrative body."  Thomas Lee Hazen, *§ 4:24.  Securities Issued in Judicially or*

*Administratively Approved Reorganizations—Section 3(a)(10)*, 1 Law Sec. Reg. § 4:24 (Westlaw

2021).  Section 3(a)(10) transactions are "used primarily with respect to securities issued in an

exchange pursuant to business . . . reorganizations," or "securities exchanged pursuant to

settlement of litigation."  *Id.*

In general terms, the Section 3(a)(10) transaction contemplated here would proceed as

follows.  Tarpon Bay would buy Zerez's debt from individual creditors.  Then—exactly when is

disputed—Tarpon Bay would initiate a lawsuit against Zerez.  The parties would ask the judge

presiding over that lawsuit to approve a settlement agreement that contemplated Tarpon Bay's

retiring the debt it had acquired in exchange for unregistered shares of Zerez's common stock.

---

[2]     Section 3(a)(10) provides an exception from registration for "any security which is issued in exchange for
one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for
cash," so long as the terms and conditions of the agreement are judicially approved after a fairness hearing.  15
U.S.C. § 77c(a)(10).

Then, Tarpon Bay would sell the unregistered shares into the open market. Tarpon Bay would use some portion of the proceeds from each round of sales to pay back the creditors and would keep the rest for itself as profit.[3]

But we have more than just a general understanding of the parties' negotiations: On January 15, 2016, the parties set down their understanding in writing in a Liability Purchase Agreement Confidential Term Sheet (the "Term Sheet"). *See* Term Sheet, Ex. C to Decl. of S. Hicks, Doc. No. 126-3. The Term Sheet contained several relevant provisions that are now in dispute. For instance, the Term Sheet provided that Tarpon Bay would "seek court approval for the settlement of [Zerez's debt] through the issuance of [Zerez's shares]" "[w]ithin 5 business days of execution of purchase agreements" with Zerez's creditors. *Id.* at 2. I will refer to that provision as the "5-day deadline term."

In addition, pursuant to the Term Sheet, Tarpon Bay was entitled to two fees. The first was a "Signing Fee." The "Signing Fee" was a "fixed fee of $25,000" payable to Tarpon Bay "to cover its expenses including legal fees due upon the execution of the term sheet." *Id.* at 4. That fixed fee "may be paid in the form of a convertible promissory note, maturing six (6) months from the date of issuance." *Id.* That convertible promissory note "shall carry an annual interest rate of 10%, and shall be convertible into the common stock of [Zerez] at 50% of the low closing bid price for the thirty (30) days prior to conversion." *Id.* The second was a "Success Fee." The "Success Fee" contemplated that Tarpon Bay would receive a certain payment "upon the approval of the fairness of the transaction by the court." *Id.* Because there was never a fairness hearing in this case, and thus no approval of any settlement agreement by any court, the Success Fee is irrelevant.

---

[3]     *See* Hicks Depo., Doc. No. 133-2, at 123:15–20 (explaining that 70 percent of the proceeds from each round of sales would go towards paying back creditors, and 30 percent would be kept as profit).

Crucially, the final paragraph of the Term Sheet read as follows:

> The terms set forth above do not constitute a contractual commitment of [Zerez] or [Tarpon Bay], but merely represent proposed terms for possible liabilities satisfaction. Until definitive documentation is executed by all parties, there shall not exist any binding obligation, other than as described in "Confidentiality" and "Exclusivity" above which shall be binding on the parties.

*Id.* at 5. I will refer to that provision as the "definitive agreement term." Hicks testified that the definitive agreement term was "leftover" from a different agreement and that, in fact, the Term Sheet represented "essentially [the] terms of the understanding between Tarpon Bay and Zerez." Hicks Depo. Tr., Ex. A to Reply in Supp Mot. Summ. J., Doc. No. 90-1, at 126:24–27:7. However, Juan Carlos Murga ("Murga"), who was Zerez's CEO, swears that Aswani told him that he "needed to sign the Term Sheet, but that a definitive agreement would follow." Murga Decl., Ex. A to Zerez's Opp'n, Doc. No. 133-1, at ¶ 11. Murga also claims that Zerez "played no role" in drafting the Term Sheet. *See id.* at ¶ 18.

On January 27, 2016, Zerez executed a note that was apparently the "convertible promissory note" referenced in the Term Sheet that could satisfy Tarpon Bay's "Signing Fee." I will refer to that note as the "Signing Fee Note."[4] The Signing Fee Note was a 10 percent convertible promissory note in favor of Tarpon Bay in the amount of $25,000. *See* Signing Fee Note, Ex. E to Hicks Decl., Doc. No. 126-5. The Signing Fee Note was "payable on demand" and accrued interest at a rate of 10 percent per year. *See id.* at 2. Pursuant to the Signing Fee Note, Tarpon Bay was

> entitled, at its option, at any time after the issuance of this Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price . . . for each share of Common Stock at a 50% discount from the lowest closing bid price in the 30 trading days prior to the day that [Tarpon Bay] requests conversion.

---

[4]     In my previous summary judgment ruling, I referred to it as the "Promissory Note," but "Signing Fee Note" more precisely describes the Note.

*Id.* at 3.  The Signing Fee Note also stated that Zerez had an "absolute and unconditional" obligation to pay "the Outstanding Principal Amount of this Note at the Maturity Date."  *Id.* at 5. To ensure that payment under the Signing Fee Note would be possible in Zerez's common stock, Zerez was obligated to reserve 500 million shares.  *Id.* at 8.  Again, Murga represents that Zerez had no role in drafting the Signing Fee Note and that Aswani told him that he "would need to sign" the Signing Fee Note "in order to proceed" because it "was a prerequisite to entering in a definitive agreement."  Murga Decl., Doc. No. 133-1, at ¶¶ 15–16, 18.

Much of what happened in the months following January 2016 is disputed.  Clearly, between February and April, Tarpon Bay sought out Zerez's creditors:  By the end of April, Tarpon Bay had entered into Claim Purchase Agreements with eight creditors to purchase claims against Zerez in the aggregate amount of $512,874.06.  *See* Claim Purchase Agreements, Ex. F to Hicks Decl., Doc. No. 126-6.  Zerez was aware of Tarpon Bay's endeavors.  According to Tarpon Bay, throughout the entire process, Murga was "aware of the negotiations and never interposed any objections."  Tarpon Bay's Rule 56(a)1 Stmnt., Doc. No. 125, at ¶ 30.  Zerez admits that it "was aware of certain discussions" between its creditors and Tarpon Bay.  *See* Zerez's 56(a)2 Stmnt., Doc. No. 84-14, at ¶ 30.  Plainly, Zerez's admission is a significant understatement:  Two of Zerez's largest creditors were Murga (Zerez's CEO) and Claudia Lima (Zerez's Secretary and Treasurer).  *See* 2016 Q3 Report, Ex. D to Hicks Decl., Doc. No. 126-4, at 16.  In April 2016, Murga and Lima were two of the creditors who signed Claim Purchase Agreements with Tarpon Bay.  *See* Claim Purchase Agreements, Doc. No. 126-6, at 14–19 (Murga), 20–25 (Lima).

On June 13, 2016, Tarpon Bay filed a lawsuit against Zerez in Florida state court (the "Florida Case").  The Florida Case—specifically, a fairness hearing in that case—was necessary

to consummate the parties' proposed Section 3(a)(10) transaction. But the Florida Case never advanced and, again, the parties dispute why. According to Tarpon Bay, "Zerez needed to appear in the action by counsel," but Zerez never obtained counsel. *See* Tarpon Bay's Rule 56(a)1 Stmnt., Doc. No. 125, at ¶ 33. Tarpon Bay points out that it tried to help Zerez by putting it in touch with a lawyer, Rick Savage ("Attorney Savage"). *See* Hicks Depo., Doc. No. 133-2, at 160:4–22; Hicks Depo. Tr., Ex. C to Zerez's Opp'n, Doc. No. 133-3, at 16:22–25. Indeed, in a June 13 email, Murga assured Aswani that he had been in contact with Attorney Savage, who would "be sending me the paper work." Email, Ex. G to Hicks Decl., Doc. No. 126-7. But Zerez never obtained counsel.

Zerez offers a different reason for why no attorney ever appeared on its behalf in the Florida Case. According to Zerez, Attorney Savage asked for $7,000 in exchange for his representation. *See* Murga Decl., Doc. No. 133-1, at ¶ 23. Before then, Zerez had not understood that it would have to pay such a fee. *See id.* Murga also contends that, even after receiving a June 13 email from Aswani regarding Attorney Savage, he did not understand that he needed to take any further action for the Section 3(a)(10) transaction to proceed. *Id*. at ¶ 24. Sometime after June 13, Murga claims that he called Aswani to ask about the progress of the Section 3(a)(10) transaction, and Aswani told him that the transaction was imminent. *Id.* at ¶ 25.

On September 22, Murga emailed Aswani and explained that he would soon be leaving Zerez and needed to "pull back on the filing." Email, Ex. H to Hicks Decl., Doc. No. 126-8. Murga asked what he had to do to "stop and cancel the 3(a)10 filing." *Id.* On September 23, Murga was copied on an email from Mark Cheung ("Cheung")—a lawyer working for Zerez[5]— to Aswani that informed Tarpon Bay that three creditors were exercising their undisputed rights

---

[5]     Between August 2019 and, at least, November 19, 2020, Cheung was in fact Zerez's interim CEO. *See* Decl. of M. Cheung in Supp. Zerez's Partial Mot. for Summ. J., Doc. No. 134-3, at ¶ 3.

to unilaterally cancel their Claim Purchase Agreements. *See* Email, Att. to Murga Decl., Doc. No. 134-1, at 31–33. By this time, the deal had well and truly broken down.

On October 10, Murga sent a letter to Aswani on Zerez's official company letterhead. *See* Termination Letter, Ex. I to Hicks Decl., Doc. No. 126-9. In that letter, Murga "inform[ed]" Aswani that Zerez "HEREBY rescinds and cancels any and all consulting and/or services relationships with Southridge and/or Tarpon Bay . . . and further HEREBY rescinds and cancels the $25,000" Signing Fee Note. *Id.* Murga continued:

> Because no sufficient, adequate, nor material services have been provided to the Company as contemplated for and regarding said Note and a proposed 3(a)(10) transaction, and because there have been no further efforts by the parties on completing the documents and/or performing on the proposed transactions, the Company deems said contemplated transactions as abandoned, and the Company therefore fully rescinds, cancels, and withdraws from said proposed transactions and said Note.

*Id.*

On October 17, Tarpon Bay responded through a letter from its attorney. In that letter, Tarpon Bay's lawyer claimed that Zerez had "no grounds to rescind" the Signing Fee Note and that Tarpon Bay rejected that rescission attempt. *See* Tarpon Bay Rejection Letter, Ex. J to Hicks Decl., Doc. No. 126-10. Tarpon Bay's lawyer demanded "immediate payment of all principal and interest due" under the Signing Fee Note. *Id*. Apparently, Zerez did not respond to that letter. Indeed, it appears that there was no communication between the parties during the rest of October and nearly all of November.

However, on November 29, Tarpon Bay attempted to exercise its right under the Signing Fee Note to be paid in Zerez's common stock. To that end, Tarpon Bay sent Zerez a "Notice of Conversion." *See* Conversion Notice, Ex. K to Hicks Decl., Doc. No. 126-11. At that time, the amount of principal and interest due under the Signing Fee Note was $27,895.89. Because the

lowest closing bid price in the 30 days before November 29 was $0.0002—and the Signing Fee

Note entitled Tarpon Bay to a 50 percent discount on that price—the discounted price per share

was $0.0001. *See id.* Thus, Tarpon Bay asserted that it was entitled to 278,958,900 shares of

Zerez common stock. Importantly, on November 28, the price of Zerez's common stock had

climbed to $0.008, *see id.*, so the market value of the shares demanded exceeded $2.23 million.

In his deposition, Hicks forthrightly admitted that the timing of Tarpon Bay's serving the

Conversion Notice was based on trying to take advantage of that rise in price. *See* Hicks Depo.

Tr., Ex. C to Zerez's Opp'n, Doc. No. 133-3, at 65:3–6 ("[I]n this case, I think the stock had

begun to move up, and we wanted to take advantage of the pricing of the lookback period.").

When it received the Conversion Notice, Zerez refused to issue the shares to Tarpon Bay. This

litigation followed.

      B.    <u>Procedural Background</u>

In March 2017, Tarpon Bay sued Zerez in Connecticut state court for breach of contract

and injunctive and declaratory relief. *See* State Court Compl., Doc. No. 1-1. In April, Zerez

removed the action to this court. *See* Notice of Removal, Doc. No. 1. Meanwhile, in January

2017, Zerez had sued the Counterclaim Defendants in the Eastern District of California. *See*

*Zerez Holdings Corp. v. Tarpon Bay Partners, LLC, et al.*, No. 2:17-cv-29-TLN-DB (E.D. Cal.).

(I will refer to that case as the "California Case.") In the California Case, Zerez asserted seven

claims for relief, many of which it asserts as counterclaims here. *See* Am. Compl., 17-cv-29-

TLN-DB (E.D. Cal.), Doc. No. 8. Due to the existence of the California Case—in which a

motion to transfer was pending—I temporarily stayed this case. *See* Order, Doc. No. 55.

In January 2018, the California Case was transferred from the Eastern District of

California to the District of Connecticut. *See Zerez Holdings Corp. v. Tarpon Bay Partners,*

*LLC*, 2018 WL 402238 (E.D. Cal. Jan. 12, 2018); *see also Zerez Holdings Corp. v. Tarpon Bay Partners, LLC, et al.*, No. 3:18-cv-82 (D. Conn.). In February, the California Case was consolidated into this case. *See* Notice of Consolidation, Doc. No. 57.

On June 1, 2018, Tarpon Bay filed an amended complaint against Zerez in which it alleged that Zerez had breached the Signing Fee Note and thus sought "immediate delivery of the 278,958,900" shares of Zerez's common stock it was owed, a declaration that it was entitled to those shares, and damages in the amount of $25.9 million. *See* Am. Compl., Doc. No. 61, at ¶¶ 21–33. In August, Zerez filed an answer, but also asserted counterclaims against the Counterclaim Defendants. *See* Answer, Doc. No. 73, at 1–6; Counterclaims, Doc. No. 73, at 7–31.

In January 2019, Tarpon Bay filed a motion for summary judgment on its affirmative claims regarding Zerez's potential breach of the Signing Fee Note. *See* Mot. for Summ. J., Doc. No. 75. In the same motion, the Counterclaim Defendants sought summary judgment with respect to Zerez's counterclaims. *Id*. In September 2019, I denied Tarpon Bay's motion for summary judgment on its affirmative claims. *See* Ruling, Doc. No. 94; *see also Tarpon Bay Partners, LLC v. Zerez Holdings Corp.*, 2019 WL 4646061 (D. Conn. Sept. 24, 2019). I held that Tarpon Bay was not entitled to summary judgment for two reasons. First, there was "a question of material fact with respect to whether the" Signing Fee Note "was supported by adequate consideration." Ruling, Doc. No. 94, at 14. Second, the Signing Fee Note was "unconscionable and, therefore, unenforceable." *Id.* at 17. More specifically, I held that the Signing Fee Note was procedurally unconscionable, in part, because Tarpon Bay "conditioned its retiring of Zerez's debt on Zerez signing" the Signing Fee Note. *Id.* at 21. I also held that the Signing Fee Note was substantively unconscionable because the Signing Fee Note's terms were

so one-sided: According to Tarpon Bay, it was "entitled to $25 million for little to nothing in return." *Id.* at 22.[6] I denied without prejudice the Counterclaim Defendants' motion for summary judgment on Zerez's counterclaims because Zerez's counsel had indicated that Zerez would likely abandon those counterclaims if I held that the Signing Fee Note was unconscionable. *See id.* at 24.

In October 2019, Tarpon Bay asked me to certify my ruling for interlocutory review. *See* Mot. for Certificate of Appealability, Doc. No. 96. I denied that motion. *See* Order, Doc. No. 101. Around the same time, Zerez gave notice that it would continue to pursue its counterclaims because Tarpon Bay stated its intent "to appeal now or at the end of this litigation." Notice, Doc. No. 100.

For some time after that, the Counterclaim Defendants struggled to retain counsel. Finally, in October 2020, the Counterclaim Defendants renewed their motion for summary judgment on Zerez's counterclaims. *See* Renewed Mot. for Summ. J., Doc. No. 124; Counterclaim Defendants' Mem. in Supp. Renewed Mot. for Summ. J. ("Counterclaim Defs.' Mem. of Law"), Doc. No. 127. Zerez opposed that motion. *See* Zerez's Opp'n to Renewed Mot. for Summ. J. ("Zerez's Opp'n"), Doc. No. 133. The Counterclaim Defendants filed a reply further in their support. *See* Counterclaim Defs.' Reply, Doc. No. 137. Nearly all of those submissions were verbatim reproductions of what the parties submitted in support of—and in opposition to—the Counterclaim Defendants' original motion for summary judgment on Zerez's counterclaims.

---

[6] Although Tarpon Bay alleges that it was owed $25 million as a result of Zerez's allegedly breaching the Signing Fee Note, *see* Am. Compl., Doc. No. 61, at ¶ 33 (alleging damages of $25.94 million), Tarpon Bay nowhere explained how it arrived at that sum. In my view, as described above, the market value of Zerez's common stock (as of November 29, 2016) that Tarpon Bay claims it was owed under the Signing Fee Note was $2.23 million (278,958,900 shares of Zerez's common stock multiplied by $0.008, the price of Zerez's common stock on November 28). *See* Conversion Notice, Doc. No. 126-11. Even so, a contract with a face amount of $25,000 that is convertible into a claim of entitlement to over $2.23 million—for "little to nothing" in return—still shocks the conscience.

In November 2020, Zerez also moved for partial summary judgment on two of its counterclaims (two and eleven). *See* Zerez's Partial Mot. for Summ. J., Doc. No. 134. The Counterclaim Defendants opposed that motion. *See* Counterclaim Defs.' Opp'n to Zerez's Partial Mot. for Summ. J. ("Counterclaim Defs.' Opp'n"), Doc. No. 138. Zerez filed a reply further in its support. *See* Zerez's Reply, Doc. No. 143. On April 28, 2021, I held a hearing on the parties' cross motions for summary judgment. *See* Min. Entry, Doc. No. 144. The main focus of our discussion that day was the possibility of settlement, and we adjourned without discussing many merits issues. After the parties reported that settlement was not currently an option, I held a second hearing on June 14. *See* Min. Entry, Doc. No. 148.

### III. Discussion

Following my ruling that the Signing Fee Note was unconscionable and unenforceable, this case has taken on an awkward posture. That is because the major dispute between the parties regarded the Signing Fee Note, which is no longer at issue. The parties' current arguments do not adequately grapple with my prior ruling's effect. In large part, Zerez's counterclaims regard the Signing Fee Note, and so they are essentially irrelevant. Even in those counterclaims regarding the Term Sheet or any implied-in-fact contract, Zerez frequently seeks recission. That is odd because there is virtually no reason to seek rescission. Zerez has long made clear that it believes it has no obligations to Tarpon Bay pursuant to any agreement. *See* Termination Letter, Doc. No. 126-9 (claiming, in October 2016 letter, that Zerez was withdrawing from entire business relationship with Counterclaim Defendants). Even though Tarpon Bay was armed with that knowledge, Tarpon Bay has *never* attempted to enforce any term of any contract against Zerez except pursuant to the Signing Fee Note. *See* Am. Compl.,

Doc. No. 61, at ¶¶ 5–33 (alleging three counts, all regarding the Conversion Notice and Signing Fee Note). Thus, Zerez's counterclaims do not map well onto the current posture of this case.

Numerous of Zerez's counterclaims that I am able to address on the merits do not survive summary judgment. As already mentioned, several other of Zerez's counterclaims are effectively null because they seek relief that—at this point in the case—is either duplicative or moot. Thus, I do not address them and, instead, dismiss them as moot.[7] In sum, I **grant in part and deny in part** both the Counterclaim Defendants' motion for summary judgment and Zerez's partial motion for summary judgment as set forth in the following table and explained below.

| Count | Claim | Defendant | Disposition of Counterclaim Defendants' MSJ | Disposition of Zerez's Partial MSJ |
|-------|-------|-----------|--------------------------------------------|-----------------------------------|
| 1 | Breach of implied contract | Tarpon Bay | Granted | |
| 2 | Declaratory relief | Tarpon Bay | Denied | Granted |
| 3 | Breach of fiduciary duty | Southridge | Granted | |
| 4 | Usury | Tarpon Bay | Granted | |
| 5 | Rescission – failure of consideration | Tarpon Bay | Denied | |
| 6 | Fraudulent inducement | Counterclaim Defendants | Denied | |
| 7 | Mistake | Counterclaim Defendants | Denied | |
| 8 | Aiding and abetting | Counterclaim Defendants | Granted | |
| 9 | Civil conspiracy | Counterclaim Defendants | Denied | |
| 10 | Violation of the UCL | Counterclaim Defendants | Granted | |
| 11 | Violation of CUTPA | Counterclaim Defendants | Granted | Denied |

---

[7] As explained below, my analysis turns, in large part, on my prior ruling that the Signing Fee Note was an unconscionable and unenforceable contract. If that determination is reversed on appeal, the basis for some of my rulings would be vitiated, and, as a matter of fairness, I would likely allow Zerez to re-assert them following any remand.

As a result of my rulings, no claims remain live in this action.  Judgment shall enter in favor of:  (1) Tarpon Bay on Counts One and Four, (2) Southridge on Count Three, (3) the Counterclaim Defendants on Counts Eight, Ten, and Eleven, and (4) Zerez on Count Two (partially).  Judgment shall not enter in favor of any party on Counts Five, Six, Seven, and Nine (and parts of Count Two) because I dismiss those claims as moot.

A.    Count One – Breach of Implied Contract (against Tarpon Bay)

In Count One, Zerez alleges that Tarpon Bay breached an implied contract by failing to "(a) procure a definitive agreement with Zerez" and "(b) seek court approval of creditors' Claim Purchase Agreements within five (5) days of execution."  Counterclaims, Doc. No. 73, at 22 (¶¶ 67–68).  Zerez identifies the source of those implied contractual terms as the 5-day deadline and definitive agreement terms in the Term Sheet.  *See* Counterclaims, Doc. No. 73, at 22 (¶ 67).

Tarpon Bay argues that it is entitled to summary judgment because "Zerez waived any requirement that the parties' agreement be reduced to a writing more definitive than what was set forth in the Term Sheet."  Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 8.  Tarpon Bay points to Zerez's actions after it signed the Term Sheet as evidence "that Zerez was not concerned about further documenting the parties' agreement, and was content to rely on the terms as expressed in the Term Sheet."  *Id.* at 9.  Specifically, Zerez never inquired about—or indicated that it was waiting for—the status of that more definite agreement or that it was disappointed with Tarpon Bay's non-compliance with the 5-day deadline term.  And Zerez took affirmative steps to perform under the Term Sheet, such as by (1) executing the Signing Fee Note on January 27, 2016; (2) having two high-level employees—Murga and Lima—sign Claim Purchase Agreements with Tarpon Bay in April 2016; and (3) Murga's indicating in a June 2016 email that Zerez anticipated engaging with Attorney Savage to move forward with the Section

3(a)(10) transaction. *See id.* at 9–10. Further, in attempting to terminate the Signing Fee Note and the parties' entire relationship, Zerez did not single out Tarpon Bay's failures to procure a definitive agreement or to meet the 5-day deadline; rather, it referred to non-performance generally. *See* Termination Letter, Doc. No. 126-9.

In opposition, Zerez explains that whether or not Zerez waived its contractual rights is an issue of fact that survives summary judgment because "waiver always present[s] issues of fact." Zerez's Opp'n, Doc. No. 133, at 11.

In my view, the parties' arguments regarding waiver are off the mark. Tarpon Bay is entitled to summary judgment on Count One because no reasonable juror could conclude that the definitive agreement and 5-day deadline terms existed in any implied-in-fact contract between the parties. To start, the Term Sheet itself was not an enforceable contract. The unambiguous, plain terms of the Term Sheet indicate as much. *See* Term Sheet, Doc. No. 126-3, at 5 ("The terms set forth above do not constitute a contractual commitment of the Company or the Purchaser . . . . Until definitive documentation is executed by all parties, there shall not exist any binding obligation . . . which shall be binding on the parties."); *see also Realty Res. Chartered v. The HB Nitkin Grp.*, 2009 WL 2243695, at *7 (D. Conn. July 24, 2009) ("[A]n agreement to agree does not give rise to a contractual relationship."); *Dacourt Grp., Inc. v. Babcock Indus., Inc.*, 747 F. Supp. 157, 160 (D. Conn. 1990) ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of documents.") (cleaned up). In fact, Zerez concedes that much and does not attempt to enforce the Term Sheet, per se: Count One identifies the Term Sheet as a "pre-contract[ual] dealing[]" and alleges that Tarpon Bay breached an *implied* contract. *See* Counterclaims, Doc. No. 73, at 22–23 (¶¶ 66–71).

18

Zerez seems to believe, though, that the terms contained *in the Term Sheet* were also the precise terms of the implied-in-fact contract. *See, e.g.*, Counterclaims, Doc. No. 73, at 22 (¶ 68); Zerez's Opp'n, Doc. No. 133, at 11 (characterizing Tarpon Bay's "fail[ure] to enter into a definitive agreement with Zerez" and failure to "commence the 3(a)(10) Litigation within five days of the execution of the Claims Purchase Agreements" as "the heart of Zerez' first counterclaim"). Zerez thus improperly conflates the Term Sheet with whatever implied contract actually may have existed between the parties.

"An implied contract is an agreement between the parties which is not expressed in words but which is inferred from the acts and the conduct of the parties." *Brighenti v. New Britain Shirt Corp.*, 167 Conn. 403, 406 (1974). "[T]he existence of an implied in fact contract is a question of fact." *Conn. Light and Power Co. v. Proctor*, 324 Conn. 245, 258 (2016).

Some implied contract likely existed between the parties. Without executing the definitive documentation that the Term Sheet called for, Tarpon Bay entered into Claim Purchase Agreements to acquire over $500,000 of Zerez's outstanding debt and filed the Florida Case. It is difficult to believe that Tarpon Bay would have undertaken those actions if it thought that Zerez had made no return promises.

Vitally, though, no evidence suggests that either of the terms on which Count One is based—the "definitive agreement" and "5-day deadline" terms—were part of an implied-in-fact contract. Again, the only possible source for Zerez's claim that any implied-in-fact contract contained those terms is the Term Sheet itself. Zerez does not dispute that. *See* Counterclaims, Doc. No. 73, at 22 (¶ 67). But no conduct by either party—even inferentially—suggests that Tarpon Bay was obligated under any implied-in-fact contract to procure a definitive agreement from Zerez or to file the Florida Case within five days of executing each Claim Purchase

Agreement.[8]  Holding that those terms existed in any implied-in-fact contract between the parties would improperly transform the Term Sheet from an unenforceable agreement-to-agree into an enforceable contract.  Because no reasonable juror could find that the two terms that Zerez claims Tarpon Bay breached were actually terms in any implied-in-fact contract, I **grant** Tarpon Bay's motion for summary judgment on Count One.[9]

>    B.    Count Three – Breach of Fiduciary Duty (against Southridge)

In Count Three, Zerez claims that Southridge owed and breached a fiduciary duty to Zerez "when it advocated a financial strategy whereby it would personally benefit" from the proposed Section 3(a)(10) transaction and "by failing to disclose material actual conflicts of interest when it advised and advocated a financial advisory strategy to Zerez and by mismanaging corporate assets for personal use and gain."  Counterclaims, Doc. No. 73, at 24 (¶¶ 76–81).

Southridge argues both that it did not owe a fiduciary duty to Zerez and that, even if it did, it did not breach that duty.  *See* Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 11–12. In general, Southridge notes that the Term Sheet was an arms-length transaction and that Zerez was a sophisticated party.  *See* Counterclaim Defs.' Reply, Doc. No. 137, at 6–8.  Zerez sees things differently.  Zerez argues that Southridge owed a fiduciary duty to Zerez because "Zerez

---

[8]    To be sure, at a certain point—*after* Tarpon Bay had filed the Florida Case—Zerez allegedly began inquiring in general terms about the progress of the Florida Case.  *See* Murga Decl., Doc. No. 133-1, at ¶¶ 21, 25. But at no point did Zerez's conduct ever imply that Zerez believed Tarpon Bay had an obligation to file the Florida Case within five days of executing each Claim Purchase Agreement.  Instead, the uncontested evidence shows that Zerez had no expectation regarding when the Florida Case would be filed vis-à-vis execution of the Claims Purchase Agreements.  Most notably, in April 2016, Zerez knew that Claim Purchase Agreements were being signed— Zerez's CEO and Secretary/Treasurer signed such agreements on April 14, 2016, *see* Claim Purchase Agreements, Doc. No. 126-6, at 14–19 (Murga), 20–25 (Lima)—but did not say or do anything when five days passed and no court case was filed.

[9]    Notably, even if the "definitive agreement" term *was* a term in any implied-in-fact contract between the parties, Tarpon Bay indisputably did not breach that term.   The "definitive agreement" term—as articulated in the Term Sheet—did not *obligate* Tarpon Bay to procure a definitive agreement with Zerez.  Rather, the Term Sheet merely contemplated that "[u]ntil definitive documentation is executed by all parties, there shall not exist any binding obligation . . . which shall be binding on the parties."  Term Sheet, Doc. No. 126-3, at 5.

justifiably confided in Southridge resulting in its superiority and influence on Zerez." Zerez's Opp'n, Doc. No. 133, at 13. Zerez also argues that Southridge breached that fiduciary duty because it "advocated a financial strategy in order to have those entities personally benefit from the transaction without providing any benefit to Zerez." *Id.* at 14.

"[S]ome actors"—such as "agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians"—are "per se fiduciaries by nature of the functions they perform." *Iacurci v. Sax*, 313 Conn. 786, 800 (2014) (cleaned up). "Beyond those per se categories, however, a flexible approach determines the existence of a fiduciary duty." *Id.* "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 108 (2007) (cleaned up). In other words, "'trust and confidence,' 'superior knowledge, skill or expertise,' and an expectation that one party is 'under a duty to represent the interest of the other' are typically necessary, but not always dispositive, conditions giving rise to a fiduciary duty in business settings." *Iacurci*, 313 Conn. at 801. In determining whether an ad hoc fiduciary relationship exists, courts sometimes focus on whether "the fiduciary was either in a dominant position, thereby creating a relationship of dependency," or, rather, whether "the parties were either dealing at arm's length . . . or . . . were not engaged in a relationship of special trust and confidence." *Biller Assocs. v. Peterken*, 269 Conn. 716, 723–24 (2004) (quoting *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38–39 (2000)).

The Connecticut Supreme Court has emphasized that courts should proceed cautiously when considering whether a fiduciary relationship exists in the context of a business transaction. That circumspection

follows logically from the need to avoid assigning the serious, significant duties that are expected of a fiduciary to every business arrangement. Ostensibly, any time one party hires another to perform a service on their behalf, "trust and confidence" is placed in the latter party. Likewise, most customers and clients invariably rely on a service provider's "superior knowledge, skill, or expertise" in their trade. The *unique* element that inheres a fiduciary duty to one party is an elevated risk that the other party could be taken advantage of—and usually unilaterally. That is, the imposition of a fiduciary duty counterbalances opportunities for self-dealing that may arise from one party's easy access to, or heightened influence regarding, another party's moneys, property, or other valuable resources. All of this precludes us from unduly extending the scope of fiduciary obligations to all ordinary business relationships.

*Iacurci*, 313 Conn. at 801–02.

In my view, Southridge owed Zerez no ad hoc fiduciary duty. (Clearly, Southridge was not Zerez's per se fiduciary.) Zerez's sole argument emphasizes its weak position relative to Southridge. I have already recognized that imbalance in holding that the Signing Fee Note was unconscionable. *See* Ruling, Doc. No. 94, at 17–22. Zerez highlights statements from the Connecticut Supreme Court indicating that a fiduciary relationship might exist when one party's position is much superior to the other. *See, e.g.*, *Cadle Co. v. D'Addario*, 268 Conn. 441, 456 (2004).

But that is as far as Zerez's argument goes. The Term Sheet contemplated that the Counterclaim Defendants would perform a service for Zerez. Zerez does not (and cannot) claim that Southridge was ever in charge of any of its "moneys, property, or other valuable resources." *Iacurci*, 313 Conn. at 802. And Southridge was not under a duty to represent Zerez's interests. *See Southbridge Assocs., LLC v. Garofalo*, 53 Conn. App. 11, 18 (1999). Holding that Southridge owed Zerez a fiduciary duty would inappropriately impose a fiduciary relationship on one party in a normal (if arguably predatory) business relationship.

Relatedly, Zerez cites not a single case in which a Connecticut court has held a business relationship like this one to be a fiduciary relationship. In contrast, Connecticut courts have

declined to impose ad hoc fiduciary duties on parties that are much closer to per se fiduciaries than Southridge was here to Zerez. *See, e.g.*, *Iacurci*, 313 Conn. at 804–05 (holding that tax return preparer owed client no fiduciary duty); *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 641–42 (2002) (remarking, without deciding, that it is likely that "an insurer owes no fiduciary duty to its insured") (citing *Harlach v. Metro. Prop. & Liability Ins. Co.*, 221 Conn. 185, 190 (1992)).

Because Southridge did not owe a fiduciary duty to Zerez, Southridge's motion for summary judgment with respect to Zerez's breach of fiduciary duty claim is **granted**.

### C.     Count Four:  Usury (against Tarpon Bay)

In Count Four, Zerez alleges that Tarpon Bay wrongfully charged a usurious interest rate of nearly 300 percent in the Signing Fee Note based on when it issued its Conversion Notice to Zerez in November 2016. *See* Counterclaims, Doc. No. 73, at 24–25 (¶¶ 82–85). The parties debate the proper way to calculate the relevant interest rate. Tarpon Bay argues that the relevant interest rate is 10 percent, which is the per annum interest rate listed on the Signing Fee Note itself. *See* Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 13. An interest rate of 10 percent is not usurious. *See* Conn. Gen. Stat. § 37-4 (setting usurious interest floor at 12 percent). In contrast, Zerez argues that the relevant interest rate takes into account the windfall that Tarpon Bay sought from the discounted "conversion shares" that Tarpon Bay sought as payment under the Signing Fee Note. *See* Zerez's Opp'n, Doc. No. 133, at 15–16. Incorporating those "conversion shares" would result in an enormous interest rate that would clearly be usurious.

I need not engage with the parties' debate because Zerez's usury claim fails for an antecedent reason:  Usury law is not applicable to this dispute at all.  Usury law concerns loans.

*See* Conn. Gen. Stat. § 37-4 (explaining that it is unlawful to "loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum"). Indeed, the Second Circuit has recently made clear (in construing New York law) that "usury laws only apply to loans," and so, "[i]f there is no loan, there can be no usury, however unconscionable the contract may be." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 962 F.3d 86, 89 (2d Cir. 2020) (cleaned up). All the cases that the parties cite in their support concern loans, not a promissory note exchanged for services.[10] In this case, the Signing Fee Note was not a loan: It was a purported contract for services. For that reason, I **grant** the Counterclaim Defendants' motion for summary judgment with respect to Zerez's usury claim.

> D.   Counts Two (against Tarpon Bay), Five (against Tarpon Bay), and Seven (against Counterclaim Defendants): Declaratory Relief and Rescission

In Count Two, Zerez "desires a judicial determination of its rights and duties, if any, under the [Signing Fee] Note, and any implied in fact contract and declaration as to Tarpon's obligations to provide any performance." Counterclaims, Doc. No. 73, at 23 (¶ 74). In Count Five, Zerez seeks rescission of the Term Sheet and the Signing Fee Note because Tarpon Bay's "consideration failed when it failed to perform according to the Term Sheet." *Id.* at 25–26 (¶¶ 86–89). In Count Seven, Zerez seeks rescission of the Signing Fee Note and Term Sheet[11] based

---

[10]   The cases Tarpon Bay cites as analogous are: (1) *LG Capital Funding, LLC v. ON4 Commc'ns, Inc.*, 2018 U.S. Dist. LEXIS 8353, at *12–14 (E.D.N.Y. Jan. 17, 2018) (repeatedly characterizing the underlying transaction as a "loan"); (2) *Beaufort Capital Partners, LLC v. Oxysure Sys., Inc.*, 2017 WL 913791, at *1 (S.D.N.Y. Mar. 7, 2017) (describing the three underlying loans at issue); and (3) *EMA Fin., LLC v. AIM Exploration, Inc.*, 2019 WL 689237, at *7 n.7 (S.D.N.Y. Feb. 19, 2019) (assuming "*arguendo* that the Note is a loan"). The cases Zerez cites as analogous are: (1) *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring, Inc.*, 105 A.D.3d 178, 180 (1st Dep't 2013) ("This foreclosure action arises from a secured loan that plaintiff . . . made to defendant."); (2) *Hillair Capital Invsts., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 337 (S.D.N.Y. 2013) ("This case involves a hedge fund seeking to recover the money it lent to a financially struggling trucking company."); and (3) *Sabella v. Scantek Med., Inc.*, 2009 WL 3233703, at *1 (S.D.N.Y. Sept. 25, 2009) ("At the center of the parties' dispute are a series of private placement transactions and loans . . . .").

[11]   Technically, Zerez may not actually seek rescission of the Term Sheet in Count Seven. *See* Counterclaims, Doc. No. 73, at 27 (¶ 98) ("Accordingly and in the alternative, there is no meeting of the minds with respect to the

on Zerez's unilateral mistake, which was a product of the Counterclaim Defendants' "acts of misrepresentation." *Id.* at 27 (¶¶ 96–98).

In their motion for summary judgment, the Counterclaim Defendants argue that Counts Two, Five, and Seven are "mooted by this Court's ruling that the Signing Fee Note is unenforceable." *See* Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 11, 14, 18. Thus, the Counterclaim Defendants argue, those counts "should be dismissed." *Id.* Zerez points out that those three counts are not moot because "the Court did not enter judgment in favor of Zerez in its ruling." Zerez's Opp'n, Doc. No. 133, at 9–10.

The Counterclaim Defendants get things backwards. In my first summary judgment ruling, I held that the Signing Fee Note was unconscionable and unenforceable. The only parties that stood to benefit under the Signing Fee Note were the *Counterclaim Defendants*. Thus, it would be a true perversion if my ruling were in any way interpreted to mean that judgment should enter *in favor of* the Counterclaim Defendants. The Counterclaim Defendants' motion for summary judgment on Counts Two, Five, and Seven is **denied**.

However, Counts Five and Seven are entirely duplicative and seek relief that I have already afforded Zerez. More specifically, in Count Five, Zerez seeks recission of "the Term Sheet as an implied in fact contract and the [Signing Fee] Note." Counterclaims, Doc. No. 73, at 26 (¶ 89). I have already held that both the Term Sheet and the Signing Fee Note are unenforceable. In Count Seven, Zerez claims that it "executed the Term Sheet and [Signing Fee] Note" as a "result of a unilateral mistake" on its part, and so "the [Signing Fee] Note should be rescinded due to such mistake." Counterclaims, Doc. No. 73, at 27 (¶¶ 96–98). Again, I have

---

[Signing Fee] Note, the [Signing Fee] Note should be rescinded due to such mistake."). The counterclaims are confusingly written, but, because the preceding paragraphs refer to both the Signing Fee Note and the Term Sheet, I interpret Zerez to be seeking rescission of both the Signing Fee Note and the Term Sheet in Count Seven.

already held that the Signing Fee Note is unconscionable and unenforceable. Thus, I **dismiss as moot** Counts Five and Seven.

Zerez also moves for summary judgment regarding Count Two. Zerez seeks "a judicial determination of its rights and duties, if any, under the [Signing Fee] Note, and any implied in fact contract." Counterclaims, Doc. No. 73, at 23 (¶ 74); *see also* Zerez's Mem. in Supp. Partial Mot. for Summ. J. ("Zerez's Mem. of Law"), Doc. No. 134-1, at 1 (Zerez seeking "a declaration that it has no obligations under the terms of the [Signing Fee] Note, the Term Sheet or any possible implied contract that Tarpon Bay may claim consistent with this Court's find[ing] that the [Signing Fee] Note was unconscionable and therefore unenforceable"). Zerez offers no argument or citation for its request. Zerez relies only on my ruling that "found the terms of the [Signing Fee] Note [to be] unconscionable and therefore unenforceable." *Id.* at 5. Tarpon Bay offers no argument in opposition other than to claim that Zerez's request is "moot."

I **grant** Zerez's motion for summary judgment on Count Two. Because the Signing Fee Note is unconscionable and unenforceable, Zerez has no rights or obligations under the Signing Fee Note. In addition, Zerez has no rights or obligations under the Term Sheet because, as described above, it was not an enforceable contract. To the extent that Zerez seeks any other declaratory relief regarding any implied-in-fact contract,[12] I **dismiss as moot** that request because Zerez does not attempt to enforce any rights under such a contract and the Counterclaim Defendants have never attempted to make Zerez perform its obligations—if it had any—under

---

[12]     Zerez words its request for relief confusingly. *See* Counterclaims, Doc. No. 73, at ¶ 72 (alleging that "[a]n actual controversy . . . exists between Zerez and Tarpon concerning their respective rights and duties under the [Signing Fee] Note, and any implied in fact contract related to the Term Sheet and [Signing Fee] Note . . . "); *id.* at ¶ 74 ("Zerez desires a judicial determination of its rights and duties, if any, under the [Signing Fee] Note, and any implied in fact contract and declaration as to Tarpon's obligations to provide any performance."). Based on that confusing language and counsel's representations at the summary judgment hearings, in my view the relief that I have granted Zerez is sufficient to address the entirety of their claim.

any such contract. *See* Am. Compl., Doc. No. 61, at ¶¶ 5–33 (alleging three counts, all regarding the Conversion Notice and Signing Fee Note).[13]

E. Count Six: Fraudulent Inducement (against Counterclaim Defendants)

In Count Six, Zerez sets forth seven "representations" that the Counterclaim Defendants made to Zerez and claims that those representations "fraudulently induced Zerez to execute the [Signing Fee] Note and Term Sheet," and so the Signing Fee Note and Term Sheet "should be declared void." Counterclaims, Doc. No. 73, at 26–27 (¶¶ 90–95). The Counterclaim Defendants point out that "the primary relief that Zerez seeks, invalidating the Signing Fee Note, is moot in light of" my ruling that the Signing Fee Note is unenforceable. Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 14.

I need not address Count Six on the merits because the relief that Zerez seeks in Count Six is entirely duplicative of the relief I have already granted it. Specifically, the only remedy that Zerez seeks in Count Six is rescission of the Signing Fee Note and the Term Sheet. *See* Counterclaims, Doc. No. 73, at 27 (¶ 95) ("[B]ecause Counterclaim Defendants fraudulently induced Zerez to execute the [Signing Fee] Note and Term Sheet, they should be declared void.").[14] I have already held that the Signing Fee Note is unconscionable and unenforceable. And, above, I have also held that the Term Sheet was an unenforceable agreement to agree.

---

[13]     At the June 14 summary judgment hearing, the Counterclaim Defendants' counsel confirmed that, in his client's view, this entire case is about the Signing Fee Note.

[14]     Technically, rescission is not the only remedy available to Zerez because it could seek to affirm the Signing Fee Note and Term Sheet. *See Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 277 Conn. 21, 32 (2006) (explaining that the "two types of remedies available" to "a plaintiff who has been fraudulently induced to enter into a transaction" are (1) "rescission of the underlying contract and restitution," or (2) "affirmance of the contract and recovery of the damages caused by the defendant's fraud"); *Harold Cohn & Co. v. Harco Int'l, LLC*, 72 Conn. App. 43, 49–50 (2002) ("A defrauded party has the option of seeking rescission or enforcement of the contract and damages."); *Texaco, Inc. v. Golart*, 206 Conn. 454, 459 n.5 (1988) ("[F]raud in the inducement of a contract ordinarily renders the contract merely voidable at the option of the defrauded party, who also has the choice of affirming the contract and suing for damages.") (cleaned up). However, Zerez's pleadings and its instant motion make clear that it seeks only rescission. Previously, Zerez argued—and I agreed—that the Signing Fee Note was unconscionable and unenforceable. And, here, Zerez argues that, as a result of the Counterclaim Defendants' fraudulent inducement, the Term Sheet should be declared void. *See* Counterclaims, Doc. No. 73, at 27 (¶ 95).

Thus, both the Signing Fee Note and the Term Sheet are legally void, and so Count Six is moot and seeks duplicative relief. I **deny without prejudice** the Counterclaim Defendants' motion for summary judgment on Count Six, but I **dismiss Count Six as moot**.

      E.      Counts Eight and Nine: Aiding and Abetting and Civil Conspiracy (against Counterclaim Defendants)

In Count Eight, Zerez accuses the Counterclaim Defendants of aiding and abetting each other in inducing Zerez to enter into the Term Sheet and the Signing Fee Note. *See* Counterclaims, Doc. No. 73, at 27–28 (¶¶ 99–102). And in Count Nine, Zerez claims that the Counterclaim Defendants conspired together and "agreed unlawfully to induce Zerez to enter into the Term Sheet" and the Signing Fee Note. *Id.* at 28 (¶¶ 103–05). The Counterclaim Defendants claim that they are entitled to summary judgment on both counts because they are not liable for any underlying tort and did not commit any unlawful acts. *See* Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 19–21. Zerez disagrees and rests on its position that the Counterclaim Defendants are liable for underlying torts. *See* Zerez's Opp'n, Doc. No. 133, at 21–22.

To hold a defendant liable for aiding and abetting, a plaintiff must prove the following three elements:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Efthimiou v. Smith*, 268 Conn. 499, 505 (2004) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). "[P]laintiffs alleging aiding and abetting liability must prove an underlying tort that defendants allegedly facilitated." *Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F. Supp. 2d 109, 121 (D. Conn. 2010); *see also Williams v. Cmty. Sols., Inc.*, 932 F.

Supp. 2d 323, 333 n.6 (D. Conn. 2013) ("[F]or tort liability to be based on a theory of . . . aiding and abetting, the plaintiffs must have a viable claim for the underlying tort.").  Put differently, "what must be proven for aider-abettor liability is that the individual gave substantial assistance to the tortfeasor in carrying out the tort with the knowledge—or reckless indifference to the possibility—that the assistance would aid in carrying out that tort." *Master-Halco, Inc.*, 739 F. Supp. 2d at 121.

As described above, no underlying tort claim survives in this case.  I have explained why the Counterclaim Defendants are entitled to summary judgment on Zerez's counterclaim alleging breach of fiduciary duty (Count Three) and why Tarpon Bay is entitled to summary judgment on Zerez's counterclaim alleging usury (Count Four).  The only other substantive tort alleged in Zerez's counterclaims is fraudulent inducement (Count Six).  I have dismissed that claim as moot because it seeks relief that I have already afforded to Zerez.

Even if Zerez *could* maintain part of its claim for fraudulent inducement, though, its aiding and abetting claim would still fail.  Zerez's fraudulent inducement claim is asserted against *all three Counterclaim Defendants* without specification.  *See* Counterclaims, Doc. No. 73, at 26–27 (¶¶ 90–95).  To succeed on an aiding and abetting claim, Zerez must identify a "principal" violation (and who committed it) and which defendant(s) *aided* in that principal violation.  "[I]t goes without saying that individuals cannot aid and abet themselves." *Master-Halco, Inc.*, 739 F. Supp. 2d at 121; *cf. Martinez v. Premier Maint., Inc.*, 185 Conn. App. 425, 434 (2018) (explaining, in the context of the Connecticut Fair Employment Practices Act, that a "defendant cannot have discriminated against the plaintiff and at the same time aided and abetted its discrimination against him."); *see also Farrar v. Town of Stratford*, 537 F. Supp. 2d 332, 356–57 (D. Conn. 2008).

In Count Eight, Zerez simply alleges that all three Counterclaim Defendants—two highly-related entities and an individual who controlled both—jointly defrauded it. *See* Counterclaims, Doc. No. 73, at ¶¶ 99–101 (claiming that the Counterclaim Defendants "knew or should have known that their respective conduct constituted breaches of their respective duties to Zerez" and "knowingly provided substantial assistance to each other in inducing Zerez to enter the Term Sheet and [Signing Fee] Note"). Because Zerez has not adequately alleged—much less established a genuine issue of material fact regarding—aiding and abetting liability, I **grant** the Counterclaim Defendants' motion for summary judgment on Count Eight.

In Connecticut, there is "no independent claim of civil conspiracy." *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 636 (2006) (cleaned up). "Rather, the action is for damages caused by *acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself," and so "a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Id.* (cleaned up). In other words, "[c]ivil conspiracy is not an independent claim but an action for damages against those who agree to join in a tortfeasor's conduct." *Garcia v. Hebert*, 2014 WL 1316096, at *2 (D. Conn. Mar. 28, 2014). The elements of civil conspiracy are:

> (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.

*Macomber*, 277 Conn. at 635–36 (cleaned up).

Once again, the only underlying tort that I have not dismissed on the merits is Zerez's counterclaim for fraudulent inducement (Count Six). I dismissed Count Six as moot because the relief that Zerez sought in that count—rescission of the Signing Fee Note and Term Sheet, *see* Counterclaims, Doc. No. 73, at 27 (¶ 95)—had already been granted to Zerez. In Count Nine,

Zerez makes essentially the same claim as in Count Six. *See* Counterclaims, Doc. No. 73, at 28 (¶ 103) (civil conspiracy count claiming that Zerez was harmed because "Counterclaim Defendants agreed unlawfully to induce Zerez to enter into the Term Sheet and [Signing Fee] Note, and breach their duties to Zerez").

I dismiss Count Nine (alleging civil conspiracy) as moot for precisely the same reason that I dismissed Count Six (fraudulent inducement) as moot. A civil conspiracy action seeks to remedy "damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself." *Harp v. King*, 266 Conn. 747, 779 n.37 (2003); *see also Doe v. Norwich Roman Catholic Diocese*, 909 A.2d 983, 986 (Conn. Super. Ct. 2006) ("No damages are awarded for civil conspiracy, but they are assessed as a result of the underlying tort that harmed the plaintiff.") (citing *Litchfield Asset Mgmt. Corp. v. Howell*, 70 Conn. App. 133, 140 (2002)). In my view, then, the remedy available for civil conspiracy is whatever remedy is available for the underlying tort. *Cf. Macomber*, 277 Conn. at 636 ("[T]he purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, simply by virtue of their agreement to engage in the wrongdoing."). Here, Zerez sues the same entities—all three Counterclaim Defendants—for both fraudulent inducement and civil conspiracy. Thus, for exactly the same reasons that Zerez gains nothing from pursuing its fraudulent inducement claim at this time, Zerez also gains nothing from pursuing its civil conspiracy claim. I thus **deny without prejudice** the Counterclaim Defendants' motion for summary judgment on Count Nine and **dismiss as moot** Count Nine.

F.     Count Ten:  Violation of UCL (against all Counterclaim Defendants)

In Count Ten, Zerez claims that the Counterclaim Defendants engaged in unfair competition within the meaning of the California Unfair Competition Law ("UCL") by (a) failing to disclose conflicts of interest among the Counterclaim Defendants, (b) failing to perform according to the Term Sheet, (c) fraudulently attempting to acquire Zerez's common stock pursuant to both the Term Sheet and the Signing Fee Note, and (d) claiming any right or title to money damages pursuant to either the Term Sheet or the Signing Fee Note. *See* Counterclaims, Doc. No. 73, at 28–29 (¶¶ 106–07). The Counterclaim Defendants seek summary judgment on Count Ten because (1) the UCL is inapplicable to this case, and (2) even if the UCL applies, the claim fails on the merits. *See* Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 21–23. Zerez takes the opposite positions. *See* Zerez's Opp'n, Doc. No. 133, at 22–23.

"The UCL broadly proscribes 'unfair competition,' defined as 'any unlawful, unfair or fraudulent business act or practice.'" *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019) (quoting Cal. Bus. & Prof. Code § 17200).[15] The UCL embodies the remedial purposes of "promoting fair competition and consumer protection." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1094 (9th Cir. 2017). In general, a private plaintiff may bring a claim under the UCL when that person "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322–327 (2011). To establish an "injury in fact," it is enough for a plaintiff to demonstrate that it "surrendered in a transaction more, or acquired in a transaction less, than he or she otherwise would have." *Cappello*, 394 F. Supp. 3d at 1019–20 (quoting *Kwikset*, 51 Cal. 4th at 323) (cleaned up). "The remedies available in a UCL . . . action are

---

[15] Technically, "[e]ach prong—fraudulent, unfair, and unlawful—is independently actionable," and Zerez should have (but did not) specify the theory or theories that it pleaded. *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013).

generally limited to injunctive relief and restitution." *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 631 (2010).

Importantly, courts are clear that not all business disputes that give rise to lawsuits can support UCL claims. The parties agree on that much, but they disagree regarding the dividing line and on what side of the line this case falls.

The Counterclaim Defendants argue that it is "not generally appropriate" for a plaintiff to bring a UCL claim "to resolve sophisticated business finance issues." Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 21. The Counterclaim Defendants cite numerous cases that remark on the inapplicability of the UCL to many business disputes. *See, e.g.*, *Pierry, Inc. v. Thirty-One Gifts, LLC*, 2017 WL 4236934, at *7 (N.D. Cal. Sept. 25, 2017) ("The UCL may be used to vindicate the rights of individual consumers who are parties to a contract, but it is not generally appropriate for resolving sophisticated business finance issues."); *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007) ("[W]here a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks.").

Zerez distinguishes that authority and argues that the most important consideration in determining whether a party may bring a UCL claim is the parties' sophistication. That is, in Zerez's view, the UCL applies to disputes between businesses when the plaintiff business is unsophisticated. *See* Zerez's Opp'n, Doc. No. 133, at 22. Some authority appears to support Zerez's position, too. *See, e.g.*, *In re Yahoo! Litig.*, 251 F.R.D. 459, 475 (C.D. Cal. 2008) (remarking that the true dividing line in a UCL case is whether the suing "entities were sophisticated and individually capable of seeking relief for their injuries").

In my view, the Counterclaim Defendants' position is much closer to the law. California courts routinely consider whether to apply the UCL to particular business disputes and confront the same arguments and counterarguments that the parties make here. One court framed the debate this way:

> [T]he central issue . . . is whether the public at large, or consumers generally, are affected by the alleged unlawful business practice of defendants. The relative size of the plaintiff companies and whether or not there is a contract for the plaintiffs to rely upon is secondary to the analysis of whether, as a result of the alleged unfair or fraudulent business practice, consumers are adversely affected.

*In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 998–99 (N.D. Cal. 2010). The *Webkinz* Court dismissed the plaintiffs' UCL claim because the claim "fail[ed] to state a connection to the protection of the general public," was a claim that "fundamentally sound[ed] in contract," and regarded "harm only to the Plaintiffs and Class members." *Id.* at 999.

Given that standard, it is clear that Zerez cannot sustain a UCL claim. Regardless of the level of Zerez's sophistication, Zerez's claims concern only the Counterclaim Defendants' actions in this case. *See* Counterclaims, Doc. No. 73, at 28–29 (¶¶ 106–07) (enumerating acts that the Counterclaim Defendants undertook in connection with this case). Courts routinely dismiss UCL claims when the plaintiff's allegations are so limited. *See, e.g., Macedonia Distrib., Inc. v. S-L Distrib. Co., LLC*, 2018 WL 6190592, at *9 (C.D. Cal. Aug. 7, 2018) (noting that "[i]n determining whether a defendant's business practices constitute unfair competition, the court must focus on whether the practices harmed competition or the general public" and dismissing plaintiff's UCL claim because it was "based on a contract not involving competition or the public in general"); *Thirty-One Gifts*, 2017 WL 4236934, at *8 (dismissing UCL claim because plaintiff "does not allege the public at large or consumers generally were injured by Pierry's allegedly unlawful business practices"); *Aetna Life Ins. Co. v. Bay Area Surgical Mgmt.,*

*LLC*, 2015 Cal. Super. LEXIS 13, at *12 (Cal. Super. Apr. 3, 2015) (granting summary judgment to defendant on plaintiff's UCL claim because it was "a dispute between commercial parties over their economic relationship" and the plaintiff was "neither a consumer nor a competitor of" defendant); *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141, 1154 (E.D. Cal. 2013) ("[A] UCL claim fails if it lacks any connection to the protection of fair competition or the general public."). For those reasons, I **grant** the Counterclaim Defendants' motion for summary judgment on Count Ten.

G.  Count Eleven: Violation of CUTPA (against all Counterclaim Defendants)

In Count Eleven, Zerez alleges that the Counterclaim Defendants violated CUTPA because "their conduct was unfair, immoral, oppressive, unethical, unscrupulous, and/or deceptive and has caused substantial injury to Zerez." *See* Counterclaims, Doc. No. 73, at 29–30 (¶¶ 108–12). The Counterclaim Defendants argue that nothing they did was deceptive: "[T]he debt reduction plan contemplated by the Term Sheet represents, essentially, exchanging debt for equity," which "is a viable – and commonplace – solution for companies that want to reduce liabilities in order to attract fresh capital." Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 24; *see also* Counterclaim Defs.' Reply, Doc. No. 137, at 13. In contrast, Zerez argues that the Section 3(a)(10) transaction contemplated here would have seen the Counterclaim Defendants "obtain hundreds of millions of shares of Zerez's stock for doing absolutely nothing, which it could then immediately sell to the detriment of Zerez, its shareholders, and the general public." Zerez's Opp'n, Doc. No. 133, at 24. Zerez points to a secondary source and two SEC proceedings that, it claims, establish the "predatory nature of [Section 3(a)(10)] transactions." *Id.* at 25.

In its affirmative motion for summary judgment on Count Eleven, Zerez argues that the Counterclaim Defendants engaged in a deceptive practice because an "illegal and unconscionable transaction . . . constitutes a CUTPA violation." Zerez's Mem. of Law, Doc. No. 134-1, at 7. Further, Zerez argues that it sustained an ascertainable loss, as required by CUTPA, because (1) "Zerez did not receive what was promised, the reduction of its liabilities to enable it to attract more investors," and so "Zerez has been encumbered by Tarpon Bay's lingering claim to shares to which it is not entitled," and (2) it seeks attorneys' fees. *Id.* at 10. In support of (1), Zerez cites to conclusory paragraphs in declarations from Cheung and Murga claiming that Zerez suffered financially from 2016 "to this day"; none of those paragraphs cites to support in the record. *See id.* at 10–11; Decl. of M. Cheung in Supp. Zerez's Partial Mot. for Summ. J., Ex. B to Zerez's Partial Mot. for Summ. J., Doc. No. 134-3 ("Cheung Decl."), at ¶¶ 4–7; Murga Decl., Doc. No. 133-1, at ¶ 26.

In opposition, the Counterclaim Defendants offer several counterarguments. First, the Counterclaim Defendants claim that CUTPA does not apply to the "Signing Fee Note, the conversion notice, and the contemplated Section 3(a)(10) transaction" because those all "fundamentally involved the purchase and sale of Zerez's common stock," and so they are governed exclusively by the Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-2, *et seq.* (the "CUSA"). Counterclaim Defs.' Opp'n, Doc. No. 138, at 5–6. Second, even if CUTPA applied, the Counterclaim Defendants did not violate CUTPA because they did not engage in any deceptive or unfair conduct. *See id.* at 7–9. Finally, the Counterclaim Defendants argue that Zerez has not established that it suffered an ascertainable loss. First, according to the Counterclaim Defendants, Zerez cannot rely on its attorneys' fees to establish an ascertainable loss. *See id.* at 10. Second, the Counterclaim Defendants contend that there is at least an issue

of fact with respect to whether the transactions at issue in this case caused Zerez harm. *See id.* at

11–13. The Counterclaim Defendants point out that Zerez's finances at the end of 2017 were

*much better* than they were at the end of 2016. *See* 2017 Annual Report, Ex. 2 to Decl. of G.

Richardson in Supp. Counterclaim Defendants' Opp'n, Doc. No. 138-3, at 10 (gross profit from

2017 was $1,421,665, whereas gross profit from 2016 was $71,500). In fact, although the

Counterclaim Defendants do not note it, Zerez also did better in 2016 than it had in 2015. *See*

2016 Annual Report, Ex. A to Hicks Decl., Doc. No. 126-1, at 14 (gross profit from 2016 was

$71,500.10, whereas gross profit from 2015 was $32,082).

In reply, Zerez argues that CUTPA—rather than CUSA—applies because at issue here

are contracts for services, not the purchase or sale of securities. *See* Zerez's Reply, Doc. No.

143, at 2. According to Zerez, the fact that the Signing Fee Note was a "note" is of no moment

because courts in Connecticut routinely apply CUTPA to promissory notes, which are contracts.

Even though the Counterclaim Defendants could elect to redeem the balance due under the

Signing Fee Note in Zerez's common stock, Zerez argues that "[t]here simply was no causal

connection between the allegedly fraudulent acts of the [Counterclaim Defendants] and the effort

to convert the [Signing Fee Note] into shares." *Id.* at 4.

I need not decide whether CUSA or CUTPA applies to the Signing Fee Note because,

even if CUTPA applied, the Counterclaim Defendants would be entitled to summary judgment

on Zerez's CUTPA counterclaim. That is so for two reasons. First, in large part, Zerez simply

asserts a breach of contract claim in the guise of a CUTPA claim. Second, with respect to any

portion of Zerez's CUTPA claim that is based on the Signing Fee Note, Zerez has not established

that it suffered an ascertainable loss.  Thus, I grant the Counterclaim Defendants' motion for summary judgment on Count Eleven.[16]

Under CUTPA, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages."  *Id.* § 42-110g(a).  Thus, "[t]o prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) each class member claiming entitlement to relief under CUTPA has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices."  *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217 (2008) (cleaned up).

Once those two threshold requirements are met, "to determine whether a business practice violates CUTPA, Connecticut courts follow the Federal Trade Commission's cigarette rule."  *Hernandez v. Apple Auto Wholesalers of Waterbury LLC*, 460 F. Supp. 3d 164, 182 (D. Conn. 2020).  According to that rule, a court will consider:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;

---

[16]      In their briefing in support of their motion for summary judgment on Zerez's CUTPA counterclaim, the Counterclaim Defendants did not argue that they were entitled to summary judgment based on Zerez's not having sustained an ascertainable loss.  *See* Counterclaim Defs.' Mem. of Law, Doc. No. 127, at 24–25.  It was only in their briefing in *opposition to* Zerez's affirmative motion for summary judgment that the Counterclaim Defendants argued that Zerez had failed to establish that it suffered an ascertainable loss.  *See* Counterclaim Defs.' Opp'n, Doc. No. 138, at 10–13.  However, at the June 14 motion hearing in this matter, the Counterclaim Defendants clarified that they also advance the argument that they are *entitled* to summary judgment on Count Eleven based on Zerez's failure to establish an ascertainable loss.

> (3) whether it causes substantial injury to consumers (or competitors or other businesspersons).

*Id.* (quoting *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119–20 (2d Cir. 2004)) (cleaned up). "All three criteria do not need to be satisfied to support a finding of unfairness." *Id.* (quoting *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 106 (1992)).

"[T]he ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 190 (2d Cir. 2020) (quoting *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 615 (1981)) (cleaned up). "Whether the plaintiff's actions resulted in an ascertainable loss is a question of fact . . . ." *Coppola Constr. Co., Inc. v. Hoffman Enters. Ltd. P'ship*, 157 Conn. App. 139, 197 (2015) (cleaned up). "An ascertainable loss is a loss that is capable of being discovered, observed or established." *Artie's Auto Body*, 287 Conn. at 218 (cleaned up). "The term loss necessarily encompasses a broader meaning that the term damage, and has been held synonymous with deprivation, detriment and injury." *Id.* (cleaned up). "A plaintiff also must prove that the ascertainable loss was caused by, or a result of, the prohibited act." *Id.* (cleaned up). When, as here,[17] a plaintiff seeks money damages pursuant to its CUTPA claim, CUTPA's causation requirement "requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff." *Id.* (cleaned up); *see also Larobina v. Wells Fargo Bank, N.A.*, 2014 WL 3419534, at *3 (D. Conn. July 10, 2014). A plaintiff has not established an ascertainable loss when the plaintiff fails "to present any evidence concerning the nature and extent of the injury sustained." *Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262, 275 (D. Conn. 2005) (quoting *A Secondino and Son, Inc. v. LoRicco*, 215 Conn. 336, 344 (1990)). Put differently, an

---

[17]    *See* Counterclaims, Doc. No. 73, at 30 (¶ 111) ("As a direct and proximate result of Counterclaim Defendants' violation of CUTPA, Zerez has suffered an ascertainable loss of money and property, and Counterclaim Defendants are liable to Zerez for actual damages, punitive damages, attorneys' fees and costs.").

ascertainable loss "must still be measurable," even if "the precise amount of the loss is not known." *Conn. Fair Housing Ctr. v. Corelogic Rental Prop. Sols., LLC*, 369 F. Supp. 3d 362, 381 (D. Conn. 2019) (quoting *Artie's Auto Body*, 287 Conn. at 217–18) (cleaned up).

"[N]ot every contractual breach rises to the level of a CUTPA violation." *Naples v. Keystone Bldg. and Dev. Corp.*, 295 Conn. 214, 228 (2010) (cleaned up). Put differently, "a simple breach of contract claim cannot [support] a CUTPA claim." *Ruby v. Chase Manhattan Bank*, 2002 WL 725495, at *1 (Conn. Super. Ct. Mar. 25, 2002); *see also Wolfberg v. Advantage Modular Homes of New England, LLC*, 2007 WL 1675625, at *1 (Conn. Super. Ct. May 22, 2007); *GJN Advisors, Inc. v. Woolrich, Inc.*, 2009 WL 10688754, at *1 (D. Conn. Oct. 13, 2009) (noting that "[a] breach of contract, even if intentional, cannot support a cause of action under CUTPA," and dismissing CUTPA claim because "all that [plaintiff] has done is re-plead a breach of contract action in the guise of a CUTPA claim").

Here, to the extent that Zerez stakes its CUTPA claim on a breach of any implied contract that in some way resembled the Term Sheet, that claim fails because a breach of contract claim, alone, cannot form the basis for a CUTPA claim. *See Ruby*, 2002 WL 725495, at *1. In Count One (breach of implied contract claim), Zerez claimed, in relevant part, that it was damaged "by loss of debt relief, capital infusion and investors." Counterclaims, Doc. No. 73, at 23 (¶ 71). Although its actual CUTPA claim is extremely threadbare, *see id.* at 29–30 (¶¶ 108–12), Zerez argues that the Counterclaim Defendants' unethical behavior harmed Zerez because Zerez "did not receive what was promised, the reduction of its liabilities to enable it to attract more investors." Zerez's Mem. of Law, Doc. No. 134-1, at 10 (in context of ascertainable loss discussion); *see also* Cheung Decl., Doc. No. 134-3, at ¶¶ 4–7. Zerez's breach of implied contract and CUTPA claims, then, are substantially identical. Zerez does not argue—and no

reasonable juror could find—that, even if Tarpon Bay breached any implied-in-fact contract, Tarpon Bay did so in a particularly deceptive way.[18]  *See Naples*, 295 Conn. at 227 (agreeing with defendant who argued that "this was a simple breach of contract case that lacked the unethical behavior or other aggravating factors necessary to rise to the level of a CUTPA violation").  Thus, to the extent that Zerez's CUTPA claim is based on any harm flowing from any alleged breach of an implied contract, it fails because it is a simple breach of contract claim.

Zerez seemingly also argues that the Counterclaim Defendants' actions with respect to the Signing Fee Note amount to a CUTPA violation.  *See* Zerez's Mem. of Law, Doc. No. 134-1, at 10 ("Zerez has been encumbered by Tarpon Bay's lingering claim to shares to which it is not entitled.") (in context of ascertainable loss discussion); *see also* Cheung Decl., Doc. No. 134-3, at ¶¶ 4–7 (repeatedly mentioning Counterclaim Defendants' "pending claim to shares").  Even if that is Zerez's theory of CUTPA violation, it fails because Zerez has not suffered an ascertainable—that is, measurable—loss.  Zerez's argument turns everything upside down.  The Signing Fee Note outlined a fee that Zerez *owed to Tarpon Bay*.  Thus, Zerez did not stand to benefit from the Signing Fee Note—it stood to lose.  And there is no dispute:  Zerez did *not* lose, at least in the obvious sense:  When Tarpon Bay issued the Conversion Notice and attempted to recover on the Signing Fee Note, Zerez did not issue the shares.  In September 2019, I held that the Signing Fee Note was unconscionable and unenforceable.  Thus, it is worth noting that Zerez is out-of-pocket $0 as a result of the Signing Fee Note dispute.[19]

---

[18]      Indeed, Zerez was fully aware of the main steps that Tarpon Bay took to effectuate certain terms in the Term Sheet.  For instance, in late January 2016, Murga signed the Signing Fee Note.  And in April 2016, Murga and Lima signed Claim Purchase Agreements.

[19]      Again, Zerez never stood to gain any benefit from the Signing Fee Note—it was merely an obligation.  Thus, it does not matter that, under Connecticut law, a plaintiff might be able to establish an ascertainable loss for purposes of an alleged CUTPA violation based on having been denied the benefit of his bargain.  *See Gervais v. Riddle & Assocs., P.C.*, 479 F. Supp. 2d 270, 280 (D. Conn. 2007) ("Certain language in Connecticut case law may suggest that CUTPA's ascertainable loss requirement is satisfied simply by a deprivation of the benefit of plaintiff's bargain.").

Following my unconscionability ruling, Zerez submitted a declaration from Mark Cheung that claimed—in extremely general terms—that the Counterclaim Defendants' efforts to recover on the Signing Fee Note somehow "hampered Zerez' ability to move any business forward," "disrupted Zerez's new Smart Cannabis operations from the outset," "restricted Zerez' ability to conduct business," and "continues to plague Zerez to this day." Cheung Decl., Doc. No. 134-3, at ¶¶ 4–7. Cheung's Declaration cites no record evidence. And Zerez provides not a single example of how its business was hampered in any way by the Counterclaim Defendants' efforts to recover on the Signing Fee Note. Instead, the record evidence indicates that Zerez's financial performance *improved* year-over-year from 2015 to 2017. *See* 2017 Annual Report, Ex. 2 to Decl. of G. Richardson in Supp. Counterclaim Defendants' Opp'n, Doc. No. 138-3, at 10; 2016 Annual Report, Ex. A to Hicks Decl., Doc. No. 126-1, at 14. Zerez does not address that fact. Zerez provides no indication—let alone any factual basis—regarding how one might measure the amount it claims it lost. Relatedly, Zerez has submitted no evidence that might lead to a permissible inference that the Counterclaim Defendants' efforts to recover on the Signing Fee Note might have *proximately caused* whatever loss Zerez believes it suffered.

No reasonable juror could find that Zerez suffered an ascertainable loss resulting from the Counterclaim Defendants' efforts to recover on the Signing Fee Note.[20] Because Zerez's CUTPA claim with respect to the Signing Fee Note stumbles at the first hurdle—proving an ascertainable loss is a threshold issue for all CUTPA claims—I do not address whether the Counterclaim Defendants' actions with respect to the Signing Fee Note were deceptive and thus

---

[20]     Zerez also cannot rely on the attorneys' fees it has incurred in litigating this action to establish an ascertainable loss. *See Rizzo Pool Co. v. Del Grosso*, 232 Conn. 666, 684–85 (1995) (remarking, without deciding, that "it is doubtful that the defendants would have been able to establish that the attorney's fees they incurred in defending the plaintiff's action constituted damages recoverable under" CUTPA); *Bloomfield Health Care Ctr. of Conn. LLC v. Jones*, 2018 WL 1936537, at *1 (Conn. Super. Ct. Apr. 2, 2018) (acknowledging that "no binding appellate authority regarding the issue of whether attorneys['] fees could constitute an ascertainable loss under CUTPA exists," but highlighting the Supreme Court's dicta in *Rizzo Pool Co.* and pointing out that "Superior Court decisions have consistently held that attorneys['] fees do not constitute an ascertainable loss under CUTPA").

actionable under CUTPA. Thus, I **grant** the Counterclaim Defendants' motion for summary judgment on Count Eleven, and **deny** Zerez's.

### IV. Conclusion

For the foregoing reasons, I **grant in part and deny in part** both the Counterclaim Defendants' motion for summary judgment (doc. no. 124) and Zerez's partial motion for summary judgment (doc. no. 134).

Judgment shall enter in favor of: (1) Tarpon Bay on Counts One and Four, (2) Southridge on Count Three, (3) the Counterclaim Defendants on Counts Eight, Ten, and Eleven, and (4) Zerez on Count Two (partially). Judgment shall not enter in favor of any party on Counts Five, Six, Seven, and Nine (and parts of Count Two) because I dismiss those claims as moot.

The Clerk is instructed to enter judgment as specified above and to close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 7th day of July 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
